NICHOLAS CADY (OSB No. 113463)
nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434.1463

DANIEL R. KRUSE (OSB No. 064023)
dkruse@cldc.org
Attorney at Law
101 East Broadway, Suite 230
Eugene, OR 97401
(541) 870.0605
(541) 345.3373 (Fax)

TANYA M. SANERIB (OSB No. 025526)
tsanerib@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(971) 717.6407
(503) 296.5454 (Fax)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS, THE CENTER FOR BIOLOGICAL DIVERSITY,** and **AUDUBON SOCIETY OF PORTLAND,**<br><br>                    Plaintiffs,<br>v.<br><br>**SCOTT TIMBER CO.** and **ROSEBURG FOREST PRODUCTS CO.,**<br><br>                    Defendants. | Case no.: 3:_____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Endangered Species Act citizen's suit, 16 U.S.C. § 1540(g) |

## INTRODUCTION

1.      Cascadia Wildlands, the Center for Biological Diversity, and the Audubon Society of Portland (hereafter Plaintiffs) bring this citizen suit pursuant to Section 11(g) of the Endangered Species Act, 16 U.S.C. §1540(g), to enjoin Scott Timber Co. and Roseburg Forest Products Co. (hereinafter Defendants) from implementing the "Benson Snake" logging operation (also called the "Little Benson" logging operation). The Benson Snake logging operation will unlawfully harm, harass, and otherwise "take" marbled murrelets, a species listed as threatened under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.

2.      The Benson Snake logging operation is in Township 23 South, Range 12 West, Section 13 and is located roughly five to six miles east and slightly north of Lakeside in Coos County, Oregon. The Benson Snake logging operation will clearcut approximately fifty acres of old-growth forests that are occupied by marbled murrelets. The operation is within a larger 355-acre area known as the Benson Ridge parcel.

3.      The entire Benson Ridge parcel was once part of the Elliott State Forest, owned and managed by the State of Oregon, but was sold to Defendants by the Oregon Department of State Lands ("DSL") in 2014. The sale followed a preliminary injunction issued by this Court against DSL, prohibiting logging in any occupied marbled murrelet habitat in the Benson Ridge parcel and the entire Elliott State Forest. *Cascadia Wildlands v. Kitzhaber*, 3:12-cv-00961-AA (D. Or. Nov. 19, 2012) (Dkt #71 at 6-7) (enjoining "any further logging activities in known occupied marbled murrelet sites in the Tillamook, Clatsop, and Elliot State Forests").

4.      In May of 2014, before the parcel was sold, members of a citizen survey organization called Coast Range Forest Watch conducted marbled murrelet surveys in the Benson Ridge parcel. These marbled murrelet surveys were conducted within the Benson Ridge

1

parcel and specifically within the Benson Snake project area, and revealed that the project area is occupied by marbled murrelets. The surveys were conducted by trained, experienced, and qualified surveyors, pursuant to established protocol, and submitted to the Oregon Department of Forestry (ODF), the United States Fish and Wildlife Service, and Defendants.

5.      Plaintiffs seek a declaratory judgment that Defendants are violating the Endangered Species Act by unlawfully harming, harassing, and otherwise taking marbled murrelets through the destruction of occupied marbled murrelet habitat. Plaintiffs further seek an injunction barring Defendants from proceeding with the Benson Snake logging operation unless and until Defendants comply with the Endangered Species Act. Plaintiffs also seek an award of their attorneys' fees and costs and such other relief that the Court deems appropriate.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction and authority to grant the relief requested by Plaintiffs pursuant to Section 11(g) of the Endangered Species Act, 16 U.S.C. §§ 1540(c),(g), along with 28 U.S.C. § 1331 (federal question), and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

7.      As required by the Endangered Species Act, 16 U.S.C. § 1540(g)(2)(A)(i), Plaintiffs provided Defendants with notice of the violations embodied within this complaint by a letter dated June 3, 2014. The notice letter is attached as an exhibit to the Declaration of Nicholas Cady, filed herewith. Plaintiffs also notified Sally Jewell, the Secretary of the Interior, and Paul Henson, the Oregon State Director of the U.S. Fish and Wildlife Service, of their intent to sue Defendants by mailing copies of the notice letter to those officials on June 3, 2014.

8.      More than sixty days have passed since the notice letter was served, and the violations complained of have begun and reasonably likely to continue to occur. Defendants

2

have already started cutting trees to build spur roads to facilitate the logging operation. Defendants submitted a Notice of Operations/Permit to Operate Power-Driven Machinery to the State Forester indicating they plan to begin clearcutting on September 6, 2016. The Secretary of the Interior has not commenced any action to impose a penalty pursuant to Section 11(a) of the Endangered Species Act, 16 U.S.C. §1540(a), and the United States has not taken any other action to prevent continued violations of the Act.

9. This Court has personal jurisdiction over Defendants because they are domiciled in, were served with process in, or maintain their principal place of business in Oregon.

10. Venue in this District is proper under Section 11(g)(3)(A) of the Endangered Species Act, 16 U.S.C. § 1540(g)(3)(A), and Section 1391 of the federal venue statute, 28 U.S.C. § 1391, because the logging operations causing take of marbled murrelets are occurring in this District and Defendants reside in this District.

11. Pursuant to Local Rule 3-2(b), Divisional Venue is proper in the Eugene Division because the challenged logging and resulting harm will occur in Coos County in this Division. Additionally, Defendants' principal place of business and registered agent are both in Dillard, Oregon in Douglas County in this Division.

## PARTIES

### Plaintiffs

12. Plaintiff Cascadia Wildlands is an Oregon non-profit organization based in Eugene, Oregon. Representing approximately 10,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

13.     Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. The organization has long advocated for improved management of forests, the protection of older forests, and for the recovery of imperiled species dependent on older forests such as the marbled murrelet. For over a decade, Cascadia Wildlands has focused on the Elliott State Forest and its imperiled species, particularly the northern spotted owl, coastal coho salmon and marbled murrelet.

14.     Plaintiff The Center for Biological Diversity ("The Center") is a non-profit organization dedicated to the preservation, protection, and restoration of biological diversity, native species, and ecosystems. The Center is based in Tucson, Arizona with offices in California, Florida, Minnesota, New Mexico, Oregon, Washington, and the District of Columbia.

15.     The organization has long advocated on behalf of the marbled murrelet and sought to strengthen protections for the bird and its habitat. The Center, for example, submitted comments to the U.S. Fish and Wildlife Service supporting continued protection for the marbled murrelet in response to a 90-day finding on a petition to remove the species from the list of endangered and threatened wildlife (Federal Register: Volume 73, Number 192, October 2, 2008). The Center also submitted comments on a proposed revision of critical habitat and has intervened in several lawsuits by timber industry organizations seeking to remove or weaken protections for the murrelet.

16.     The Center's Oregon office and Endangered Species Program have long followed and advocated for additional protections for old-growth forest lands in Oregon by attending and testifying at Board of Forestry and State Land Board meetings, advocating for stronger protections for imperiled wildlife on state and private timber lands, and participating in litigation

4

to provide greater protections for imperiled species on state forests. The Center has more than 48,500 members, including many who reside in Oregon and enjoy exploring Oregon's forests and observing, detecting, and attempting to photograph marbled murrelets.

17.    Plaintiff Audubon Society of Portland is a non-profit conservation organization with a mission to promote the enjoyment, understanding and protection of native birds, other wildlife and their habitats. The organization has long advocated for protections for dwindling marbled murrelet populations in the Pacific Northwest.

18.    In the late 1980s, Audubon Society of Portland commissioned a study by wildlife biologist David B. Marshall, concerning the health and viability of marbled murrelet populations on the West Coast. Based on the results of this study, in January 1988, Audubon Society of Portland formally petitioned the U.S. Fish and Wildlife Service to list the marbled murrelet under the Federal Endangered Species Act.

19.    After initiating these petitions, Audubon Society of Portland continued to advocate for federal and state protection and designation of critical habitat for the species. In April 1991, Audubon Society of Portland filed suit in Federal District Court in Seattle, in order to compel the Fish and Wildlife Service to discharge its mandatory duty under the Endangered Species Act by listing the murrelet as a threatened species. The Fish and Wildlife Service ultimately complied with this request in September 1992. Audubon Society of Portland continued to litigate in order to compel the Fish and Wildlife Service to designate critical habitat for the marbled murrelet. In recent years, Portland Audubon has intervened in two lawsuits attempting to delist the marbled murrelet to ensure the threatened listing remains in place.

20.    Audubon Society of Portland also owns and manages the 216-acre Ten Mile Creek Sanctuary on the Oregon Coast, which provides habitat for marbled murrelets within the

5

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

Marbled Murrelet Important Bird Area. Audubon Society of Portland holds annual survey trainings for marbled murrelets and contributes data to inland survey efforts. The organization also sponsors educational, scientific research activities that involve study of marbled murrelets and other birds and their natural habitat.

21.     Audubon Society of Portland currently has approximately 16,000 members, including many who use Oregon's coastal forests for a wide variety of recreational purposes, including wildlife viewing and attempting to view marbled murrelets.

22.     Plaintiffs have standing to bring this case. Plaintiffs are organizations whose purposes are dedicated to the protection and enjoyment of biological diversity. Many of Plaintiffs' members are active birders and devote substantial time and effort to observing and photographing marbled murrelets and their habitat in Oregon's coast range. Plaintiffs' members also enjoy recreating on forestlands in the Coast Range, including in and around the Benson Ridge parcel, and aesthetically enjoy these forest areas.

23.     Prior to the State's sale of the parcel to Defendants, Plaintiffs' birding and hiking activities had taken them to the Benson Ridge parcel. Plaintiffs enjoyed hiking and driving through the Benson Ridge parcel and observing the old-grown forests and wildlife that live there, including marbled murrelets. After the sale, Plaintiffs' members have continued to use and enjoy the Benson Ridge parcel, including viewing wildlife and the old-growth forests there from public roads within the parcel. Plaintiffs' members also continue to visit the public lands adjoining the Benson Ridge parcel and have enjoyed hiking and recreating on these lands and looking into the Benson Ridge forest parcel for wildlife. The old-growth forests on the Benson Ridge parcel and adjacent public lands are contiguous.

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

24.     Plaintiff organizations sponsor field trips to forests in Oregon, sponsor murrelet surveys, or otherwise have members who enjoy observing, detecting, photographing, and looking for marbled murrelets in Oregon forests. Plaintiffs also actively work to protect marbled murrelets and their habitat and to ensure better management of state and privately owned lands in Oregon.

25.     Plaintiffs and their members intend to continue all of these activities in the future. The aesthetic, recreational, professional, and other interests of Plaintiffs and their members in detecting, observing, photographing, studying, protecting and otherwise enjoying marbled murrelets and their habitat are impaired by the take of marbled murrelets and the loss of old-growth forests that will result from Defendants' violations of the ESA. By clearcutting and removing old-growth forests that are occupied by marbled murrelets, Defendants are causing Plaintiffs' injuries. The relief sought in this lawsuit redresses the injuries to Plaintiffs' interests.

**Defendants**

26.     Defendants Scott Timber Company and Roseburg Forest Products Company are both Domestic Business Corporations in Oregon. Though registered with the Oregon Secretary of State as separate entities, they have the same address, primary place of business, president, secretary, and registered agent. Their names are both used on documents pertaining to the purchase of the Benson Ridge parcel and the planning and approval of the Benson Snake logging operation.

27.     Defendants are the owners of the Benson Ridge parcel. Defendants are responsible for all logging operations on their property, including the logging operation challenged herein. On or about August 13, 2016, Defendants submitted a notification to the

7

Oregon Department of Forestry of their intent to clear-cut approximately fifty acres of the Benson Ridge parcel, naming the logging operation "Benson Snake."

28.     Defendants are "persons" under the Endangered Species Act and subject to the Act's requirements and prohibitions.

## STATUTORY AND REGULATORY FRAMEWORK

### The Endangered Species Act

29.     The ESA is the most comprehensive legislation for the preservation of threatened and endangered species ever enacted by any nation. Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).

30.     The term "conserve" means "the use of all methods and procedures which are necessary to bring any endangered or threatened species to the point where the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3).

31.     Before a species receives any protection under the Act, the Fish and Wildlife Service (FWS) must list the species as either "threatened" or "endangered." 16 U.S.C. §§ 1533(a) & (c). An "endangered species" is one that is "in danger of extinction throughout all or a significant portion of its range." Id. § 1532(6). A "threatened species" is one that is "likely to become an endangered species within the foreseeable future through all or a significant portion of its range." Id. § 1532(20).

32.     It is unlawful to engage in any activity that "takes" an endangered or threatened species. 16 U.S.C. §§ 1538(a)(1)(B), 1533(d); 50 C.F.R. § 17.31 (applying Section 17.21 to threatened species); 50 C.F.R. § 17.21 (making it "unlawful for any person . . . to commit, to

8

attempt to commit, to solicit another to commit or to cause to be committed . . . take"), 57 Fed. Reg. 45328 (Oct. 1, 1992) (listing the marbled murrelet as threatened).

33.     Congress intended the term "take" to be defined in the "broadest possible manner to include every conceivable way" in which a person could harm or kill wildlife.  S. Rep. No. 93-307, 93d Cong., 1st Sess. 1, reprinted in 1973 USCAAN 2989, 2995. The term "take" is defined in the statute to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. §1532(18).

34.     The implementing regulations for the Act define "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3. The term "harass" is defined to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

35.     "Persons" subject to the prohibition on take include any "individual, corporation, partnership, trust, association, or any other private entity."  16 U.S.C. § 1532(13).

36.     In order to avoid Section 9 liability, Section 10 of the Endangered Species Act authorizes the FWS to permit taking "incidental to, and not the purpose of, . . . an otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B).  In order to obtain an incidental take permit, however, the applicant must also prepare "a conservation plan" called a Habitat Conservation Plan or HCP.  Id. § 1539(a)(2)(A).  A Habitat Conservation Plan and incidental take permit can only be approved after opportunity for public comment if the "taking will be incidental," the "applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such

9

taking," sufficient funding is available to carry out the plan, and the "taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(2)(B). Other private and commercial timber entities have a HCP in Oregon to facilitate timber harvest. Defendants have not applied for or received a HCP for logging in the Benson Ridge parcel.

37.    The citizen suit provision of the ESA authorizes lawsuits against any person who is alleged to be in violation of the Act or any regulation issued under the Act. 16 U.S.C. §1540(g)(1).

38.    Where a violation of the Section 9 "take" prohibition is alleged, a Court must issue an injunction if a plaintiff establishes by a preponderance of the evidence that there is "a reasonably certain threat of imminent harm to a protected species." *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000). Because Congress has accorded the protection of endangered species the highest of priorities, courts do not have the discretion to withhold injunctive relief where it is necessary to prevent an imminent and likely violation of the ESA. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

## FACTUAL BACKGROUND

### A.    The Marbled Murrelet.

39.    The marbled murrelet (*Brachyramphus marmoratus*) is a small sea bird and the only tree nesting bird in the alcid family. Marbled murrelets spend most of their time at sea feeding on fish, but nest and engage in courtship behaviors and breeding inland in contiguous mature and old-growth forests.

40.    Murrelets do not build nests but rely on large tree branches with natural depressions and moss in which to lay their egg.

10

41.     For this reason, murrelets use tree branches that provide sufficient space for the sea bird to land and nest as platforms.  Platforms are fairly wide flat tree limbs or other surfaces that are at least four inches in diameter over thirty feet high in a living coniferous tree.

42.     Potential or suitable habitat for murrelet nesting consists of large areas of old-growth or mature forest habitat and occasionally younger coniferous forests with platforms in an area with limited edge habitat (*i.e.*, all habitat that is within 295 feet of non-habitat or the forest edge).  Marbled murrelets more commonly select larger stands of contiguous mature to old-growth forest for nesting.  These areas contain sufficient interior habitat (habitat away from a forest edge) to protect the nest from blow down during windstorms and from predation by other birds.

43.     Murrelets travel between 20 to 80 kilometers from the ocean to suitable breeding and nesting habitat on shore.  During the breeding season, marbled murrelets will cluster offshore near onshore areas that provide mature and old-growth forests for nesting.

44.     The birds do not nest every year.  When marbled murrelet nesting occurs, it takes place between mid-April and September.  Murrelets do not nest in colonies but nest solitarily.

45.     The birds have high site fidelity, returning to the same tree or stand to nest year after year.  Marbled murrelets do not usually nest in the same tree as one another, but they will nest in the same stands of trees.  Marbled murrelet feathers are cryptically colored in browns and whites to blend into the forest environment making them difficult to spot while inland.

46.     The female lays one egg and the male and female incubate the egg in shifts while the other bird feeds in the ocean. The egg is usually incubated for 30 days and fledging takes 28 days. Typically, the male and female switch incubation shifts at dawn or dusk to avoid detection by predators.

11

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

47.     Predominately due to the risk of nest predation, marbled murrelets tend to be very secretive when entering and leaving their nest sites making it difficult to detect the birds while nesting.

48.     Marbled murrelets nests are predated upon primarily by corvids, including crows, jays, and ravens.  Research demonstrates that murrelets nests are highly vulnerable to predation near forest edges where corvid species proliferate.  Predation increases in intensity where edges are coupled with human activity as remnant human garbage can cause local increases in predator species populations.

**B.     The Plight of the Marbled Murrelet**

49.     In 1992, marbled murrelets in Washington, Oregon, and California were listed as a distinct population segment that is threatened under the Endangered Species Act.

50.     The primary reason marbled murrelets are listed as a threatened species is the loss of older coastal forests that provide marbled murrelet nesting and breeding habitat.  The primary cause of forest loss and resulting marbled murrelet population declines is commercial timber harvest and related wind throw or blow down of trees, fire, and other natural events.  Marbled murrelets are also at risk from gill-net fisheries and offshore oil spills.

51.     In addition to the direct removal of marbled murrelet nesting habitat, logging also fragments marbled murrelet nesting habitat and increases edge effects, which leads to the increased risk of nest predation and tree blow down in the windy coast range.

52.     Edge effect in a forest environment typically results when part of the forest is logged, burned, or blows down in a windstorm.  The result is an area of contiguous forest next to an area that is now largely devoid of a forest landscape.  The creation of an edge in the forest habitat has environmental effects.  The area is less protected which means the forest habitat next

12

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

to the edge is warmer in the summer, more likely to blow down during windstorms in the winter, and is subject to influence from species that exist in disturbed environments (such as jays or blackberry bushes).

53. Fragmentation of the forest reduces the available habitat for nesting by breaking it into smaller pieces, creating less interior habitat, and isolating the remaining habitat in small patches. As the Fish and Wildlife Service has recognized, the ecological consequences of these habitat changes to marbled murrelets can include effects on population viability and size, local or regional extinctions, displacement, fewer nesting attempts, failure to breed, reduced fecundity, reduced nest abundance, lower nest success, increased predation and parasitism rates, crowding in remaining patches, and reductions in adult survival.

54. Since being listed as threatened under the Endangered Species Act, marbled murrelet populations in Oregon, Washington, and California have continued to decline. Population data from 2000 to 2008 shows an estimated 2.4 percent annual decline in the murrelet population and data from 2001 to 2008 show an estimated 4.3 percent annual decline. This equates to a loss of 490 birds per year based on the 2000 to 2008 data or a loss of 870 birds per year based on the 2001 to 2008 data.

55. A recent scientific study and modeling effort from 2011 documents the amount of suitable marbled murrelet habitat that exists on nonfederal lands in contrast to federal lands. The study uses models to estimate the amount of suitable marbled murrelet habitat that existed in 1996 in Oregon, Washington, and California as compared to running the same models to predict the amount of suitable marbled murrelet habitat that existed ten years later in 2006.

56. This study concluded that between 1996 and 2006, overall Oregon lost 4.7 percent of its higher suitability habitat when gains and losses were taken into account and lost 16.7

13

percent of higher suitability habitat when only losses were accounted for. The study found that the loss of higher suitability habitat "was greatest on nonfederal lands" in Oregon and that this loss of habitat on nonfederal lands was primarily (95 percent) due to logging.

57.    Specifically, the study concluded that between 1996 and 2006, 33.4 percent of the higher suitable habitat in Oregon on nonfederal lands was lost. By way of comparison, in California 8.1 percent of higher suitable habitat on nonfederal lands was lost and in Washington 30.3 percent was lost.

58.    In Oregon, it is generally assumed that private lands provide very little suitable nesting habitat for marbled murrelets. This is assumed because Oregon's logging laws and regulations do not require private timber operators to survey and/or protect marbled murrelets. Despite the application of the ESA to private timber operators, specifically Section 9's prohibition on take of imperiled species, little to no enforcement of the Act has taken place in Oregon.

59.    This regulatory misstep was highlighted in the appraisal process during the state's sale of the Benson Ridge parcel to Defendants, which noted:

> The notion that a small investor might be able to log unsurveyed murrelet habitat without consequences was not considered in this appraisal. Such activity apparently occurs, and Kevin Maurice with USFWS indicates that his agency often does not pursue violators, even when the agency is aware of a violation. Nevertheless, based on the information provided by Mr. Maurice, such activity is illegal.

**C.    Surveying for Murrelets and Identifying Occupancy**

60.    Locating marbled murrelets inland so their nesting and breeding habitat can be protected is hard to accomplish. Marbled murrelets are elusive and their nests are extremely difficult to find. This is in large part because murrelets blend well with the surrounding forest environment, and may only show activity near their nests one time per day, and may do so under

14

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

low light conditions. Therefore, occupied sites or suitable habitat become the most important parameters for managing and protecting murrelets.

61.     When marbled murrelets were first listed as a threatened species in 1992, only twenty-three nests had been located in all of North America. As of 2002, only 300 nests had been found. As a result, the scientific community has developed a set of behavioral criteria to determine if potential habitat is likely to be occupied by murrelets.

62.     The Pacific Seabird Group Inland Survey Protocol or "PSG Protocol" is this generally accepted procedure for identifying occupied sites and areas used by murrelets onshore.

63.     When logging is planned in potential marbled murrelet nesting habitat, the PSG Protocol requires that surveys be conducted in the timber sale area and in all contiguous potential nesting habitat within a minimum of one-quarter mile (402 meters) of the project area boundary. According to the protocol, "Contiguous potential habitat is that which contains no gaps in suitable forest cover wider than 100 m (328 feet)." Topographical features, specifically ridgelines, are also used to define the survey area. Surveying the contiguous habitat outside of a project area boundary is important because (1) more than one pair of birds are usually found in a single, continuous forest and interactions of murrelets in a single stand is important for social and breeding purposes; (2) murrelets could be nesting at different times – and therefore different places – in the same stand; and (3) murrelets might use more than one nest tree or use different parts of a stand for nesting.

64.     The surveys are designed to determine probable absence or presence of murrelets at a specific site, document occupancy, monitor murrelet activity levels at specific sites (*e.g.*, for a pre-harvest inspection), locate nests, and establish murrelet use patterns. Survey stations are distributed throughout the survey area and often in multiple survey sites. Because marbled

15

murrelets may not nest every year, surveys must occur for two consecutive years to determine whether the stand is occupied with any degree of confidence. Surveys are conducted between May 1 and August 5, and take place in the two-hour period from forty-five minutes before sunrise to seventy-five minutes after sunrise. A minimum of five and as many as nine surveys must be conducted at each survey site, and the surveys within a site should be separated by a minimum of six and a maximum of thirty days.

65.     According to the PSG Protocol, "an occupied site is where murrelets have been observed exhibiting subcanopy behaviors, which are behaviors that occur at or below the forest canopy and that strongly indicate that the site has some importance for breeding." Subcanopy behaviors include those "below, through, into, or out of the forest canopy within or adjacent to potential habitat." "This includes birds flying over or along roads, young stands, or recently-harvested areas adjacent to potential habitat." Occupied behavior also includes perching, landing, or attempting to land on branches, or calling from a stationary location within the stand. "In addition to direct flights to nests, murrelets can engage in 'fly-bys' before and after visits to the nest, where a nesting bird flies past the nest tree below the canopy at nest height." "While an observer may not be aware of a nest, these flights lend support for the association of subcanopy flights with nesting."

66.     Occupied sites include nest sites, but an occupied site also can be used for purposes other than nesting that are essential for the complete life history of the bird. For example, the places where birds engage in courtship or other breeding- related activities might not be in the exact same area or stand as a nest, but these areas are just as important as nesting sites for the birds' life history. Importantly, detecting occupancy behavior does not indicate

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

where the nest is located within that stand.  Thus, if occupancy behavior is detected at one site within a larger block of contiguous habitat, the entire contiguous stand is classified as occupied.

67.     Because marbled murrelets are so difficult to detect, a site is occupied if even a single occupied behavior occurs.  Because of the importance of occupied nesting habitat and the birds' fidelity to specific nesting sites, an occupied site is treated as such indefinitely.

**D.     Logging in Occupied Habitat Causes "Take" of Marbled Murrelets.**

68.     Logging in occupied habitat actually kills murrelets, and injures and annoys murrelets to such a degree as to disrupt and significantly impair essential behavioral patterns, including breeding, feeding, and sheltering.  Logging in occupied murrelet habitat causes death, displacement, fewer nesting attempts, failure to breed, nest failure, reduced fecundity, reduced nest abundance, lower nest success, increased predation and parasitism rates, crowding in remaining patches, and reductions in adult survival.

69.     Logging also causes take of marbled murrelets by fragmenting the landscape to such a degree as to cause death, injury, annoyance, and significant impairment and disruption of essential behavioral patterns.  Fragmentation and logging in suitable habitat leads to edge effects, habitat loss, predation, and disturbance of nest sites.  Several studies show a relationship between the distance from the forest edge and murrelet nest success.  Authorizing logging adjacent to and within suitable habitat also increases the loss of existing habitat from windthrow.  Fragmenting the forested landscape harms marbled murrelets by significantly disrupting and impairing essential behavioral patterns including breeding, feeding and sheltering.

**E.     The Sale of the Benson Ridge Parcel.**

70.     The Benson Ridge parcel was part of the Elliott State Forest, owned and managed by the State of Oregon, until it was sold to Defendants in 2014.  Prior to the sale of the Benson Ridge

17

parcel, this Court issued a preliminary injunction against logging in occupied marbled murrelet habitat through the entire Elliott State Forest, which then included the Benson Ridge parcel. *Cascadia Wildlands v. Kitzhaber*, 3:12-cv-00961-AA (D. Or. Nov. 19, 2012) (Dkt #71 at 6-7) (enjoining "any further logging activities in known occupied marbled murrelet sites in the Tillamook, Clatsop, and Elliot State Forests").

71.    As a result of this Court's injunction, the State Land Board looked to dispose of state lands within the Elliott State Forest. On January 17, 2014, the State Land Board announced it would hold a sealed bid auction for three parcels of Elliott State Forest including the 355-acre Benson Ridge parcel on March 28, 2014.

72.    The appraisal for the Benson Ridge parcel indicated that there was a high likelihood of the parcel being occupied by marbled murrelets and that a majority of the parcel contained suitable habitat. Although the state would have been prohibited by this Court from logging the Benson Ridge parcel if it was occupied by marbled murrelets, the appraisal noted that small investors might be able to log unsurveyed murrelet habitat without consequences because the FWS often does not pursue violations of the ESA even when the agency is aware of a violation. The appraisal did note however that such logging would be illegal.

73.    The Benson Ridge Parcel was sold to Defendant's in June of 2014.

**D.    The Benson Snake Logging Operation Will Clearcut Occupied Habitat and Cause Take of Marbled Murrelets.**

74.    In May 2014, prior to the sale of the Benson Ridge parcel to Defendants, a non-profit, citizen-survey group Coast Range Forest Watch surveyed for marbled murrelets in the Benson Ridge parcel. At least one of the group's survey stations was within the Benson Snake

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

logging area. The group also surveyed forest stands contiguous with the Benson Snake logging area.

75.    Surveyors with Coast Range Forest Watch observed and documented murrelet presence through both auditory and visual detections. On at least one occasion, a surveyor with Coast Range Forest Watch visibly observed a murrelet flying below the forest canopy indicating occupancy. Coast Range Forest Watch reported these survey results to the Oregon Department of Forestry, the Unites States Fish and Wildlife Service, and Defendants.

76.    On August 13, 2016, Defendants submitted a notification of its intent to clear-cut part of the Benson Ridge parcel, naming the logging operation "Benson Snake" or "Little Benson." Defendants intend to clearcut approximately fifty acres of old growth in the middle of the Benson Ridge parcel.

77.    Oregon Department of Forestry's report for the project was generated on August 19, 2016 and notes that Defendants must wait 15 days before logging.

78.    Plaintiffs first learned of Defendants' logging plans on August 19, 2016.

79.    Defendant's clearcutting of fifty acres of old-growth forest occupied by marbled murrelets will harm and harass the marbled murrelets that live in and around the proposed logging unit by impairing the breeding, nesting, and sheltering of the birds, injuring or killing chicks in nest trees or causing loss of eggs, and increasing the risk of predation on adults and young.

80.    Take will occur from the direct impacts of this logging while the birds are inland breeding or nesting, which impairs murrelets' essential nesting, breeding, and sheltering behaviors by flushing the birds from their nests, causing nest abandonment, death or injury to the chick, loss of the egg, and stress and accompanying biological impacts.

19

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

81.    Take will also occur through the removal of the forest stand the birds use for nesting and courtship, impairing their ability to shelter and successfully breed and nest in the stand, and increasing the risk of predation. Murrelets have high site fidelity and return to the same site to nest. The birds also visit their inland nesting areas outside the breeding season. Birds that return to their nest site to find it gone (sometimes over the course of several years due to high site fidelity) can fail to breed or nest that season and possibly for several seasons to come.

82.    By logging the center of the Benson Ridge parcel, Defendants will also fragment the remaining murrelet habitat on the parcel leaving it either undesirable or uninhabitable for marbled murrelets due to edge effects, causing further take of marbled murrelets.

83.    Defendants are causing the take of marbled murrelets through implementation of the Benson Snake logging operation.

## CAUSE OF ACTION AND RELIEF SOUGHT

### Take of Marbled Murrelets

84.    Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs 1-83.

85.    Defendants have approved and are now implementing the Benson Snake logging operation, and are thereby harming, harassing, or otherwise causing "take" of marbled murrelets in violation of the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B). Defendants are causing this take of marbled murrelets by clearcutting occupied marbled murrelet habitat in the Benson Snake logging operation and by fragmenting habitat in the Benson Ridge parcel. Defendants' unlawful actions injure Plaintiffs in the manner described in paragraphs 12 to 25 above.

WHEREFORE plaintiffs respectfully request that this Court enter an order:

20

COMPLAINT FOR DECLARATORY
& INJUNCTIVE RELIEF

1.      Declaring that Defendants are unlawfully taking marbled murrelets in violation of the Endangered Species Act;

2.      Enjoining Defendants from continuing with the Benson Snake logging operation in violation of the Endangered Species Act and that Act's implementing regulations;

3.      Enjoining Defendants from logging any of the Benson Ridge parcel unless and until Defendants obtain an ESA Section 10 permit;

3.      Awarding Plaintiffs their attorneys' fees and costs incurred as a result of this matter; and

4.      Granting Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted this 25th day of August, 2016

/s/ Nicholas Cady
NICHOLAS CADY (OSB No. 113463)
nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434.1463

DANIEL R. KRUSE (OSB No. 064023)
dkruse@cldc.org
Attorney at Law
101 East Broadway, Suite 230
Eugene, OR 97401
(541) 870.0605
(541) 345.3373 (Fax)

TANYA M. SANERIB (OSB No. 025526)
tsanerib@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(971) 717.6407

21

(503) 296.5454 (Fax)

Attorneys for Plaintiffs

22