**Dominic M. Carollo,** OSB No. 093057
Email: dcarollo@yockimlaw.com
**Ronald S. Yockim**, OSB No. 814304
Email: ryockim@yockimlaw.com
**Christopher T. Griffith,** OSB No. 154664
cgriffith@yockimlaw.com
Yockim Carollo LLP
430 S.E. Main Street
P.O. Box 2456
Roseburg, Oregon 97470
Phone:   (541) 957-5900
Fax: (541) 957-5923

Hon. Ann L. Aiken

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS, THE CENTER FOR BIOLOGICAL DIVERSITY**, and **AUDUBON SOCIETY OF PORTLAND**, <br><br> Plaintiffs, <br><br> v. <br><br> **SCOTT TIMBER CO**., and **ROSEBURG FOREST PRODUCTS CO**., <br><br> Defendants. | Case No. 6:16-CV-01710-AA <br><br> **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **Request for Oral Argument** |

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND...............................................................................3

      A.   Prior Litigation .........................................................................................3

      B.   The Elliott State Forest..............................................................................6

      C.   Marbled Murrelets......................................................................................8

      D.   The Benson Ridge Marbled Murrelet Study .............................................9

III.  STANDARD FOR PRELIMINARY INJUNCTION .......................................17

IV.   ARGUMENT ....................................................................................................18

      A.   Plaintiffs Have Not Provided a Valid 60-Day Notice .............................18

      B.   Plaintiffs Lack Standing ..........................................................................22

      C.   Plaintiffs are Unlikely to Succeed on the Merits....................................24

      D.   Plaintiffs Have Failed to Demonstrate Irreparable Harm........................30

      E.   The Balance of Harms and Public Interest Do Not
           Favor an Injunction ...............................................................................34

V.    THE BOND .......................................................................................................35

VI.   CONCLUSION..................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................................30

*Alliance for the Wild Rockies v. U.S. Dept. of Agriculture*,
772 F.3d 592 (9th Cir. 2014) ....................................................................................19

*American Rivers v. NMFS*,
109 F.3d 1484 (9th Cir. 1997) ..................................................................................19

*American Rivers v. NMFS*,
126 F.3d 1118 (9th Cir. 1997) ..................................................................................19

*Animal Welfare Inst. v. Martin*,
623 F.3d 19 (1st Cir. 2010)........................................................................................17

*Audubon Society of Portland v. National Marine Fisheries Service*,
849 F.Supp.2d 1017 (D. Or. 2011) ...........................................................................28

*Bennett v. Spear*,
520 U.S. 154 (1997)....................................................................................................21

*Cascadia Wildlands v. BLM*,
2013 WL 5723315 (D. Or. 2013)...............................................................................23

*Cascadia Wildlands et al. v. Department of State Lands*,
Case No. 62 140 7847 (Lane County Circuit Court) ...................................................5

*Cascadia Wildlands et al. v. Department of State Lands*,
CA A159061 (Oregon Court of Appeals) ....................................................................5

*Cascadia Wildlands v. Kitzhaber*,
911 F. Supp. 2d 1075 (D. Or. 2012) ...........................................................................4

*Cascadia Wildlands v. Kitzhaber*,
3:12-cv-00961-AA.......................................................................................................33

*Center for Biological Diversity v. U.S. Bureau of Reclamation*,
No. 6:15-cv-02358, Opinion and Order (April 4, 2016) (D. Or.)....................18, 26, 27

*Center for Biological Diversity v. Marina Point Dev. Co.*,
566 F.3d 794 (9th Cir. 2008)................................................................................19, 20

*Ctr. for Biological Diversity v. Henson*,
No. CIV. 08-946-TC, 2009 WL 1882827 (D. Or. June 30, 2009) .........................................4, 28

*Cetacean Cmty. v. Bush*,
386 F.3d 1169 (9th Cir. 2004) .................................................................................31

*Defenders of Wildlife v. Bernal*,
204 F.3d 920 (9th Cir. 2000) ..................................................................................25

*Defenders of Wildlife v. Salazar*,
812 F.Supp.2d 1205 (D.Mont. 2009).......................................................................31

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ..................................................................................31

*Hallstrom v. Tillamook County*,
493 U.S. 20 (1989)..................................................................................................19

*Humane Soc'y of U.S. v. Bryson*,
No. 3:12-CV-00642-SI, 2012 WL 1952329, at *5 (D. Or. May 30, 2012)..................32

*Idaho Rivers United v. United States Army Corps of Engineers*,
156 F. Supp. 3d 1252 (W.D. Wash. 2015).................................................................31

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007) .................................................................................31

*Kern County Farm Bureau v. Badgley*,
No. 02-5376-AWI-DLB, 2002 WL 34236869 at *11 (E.D. Cal. Oct. 10, 2002). ......................19

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..................................................................................................22

*Marbled Murrelet v. Pacific Lumber Co.*,
880 F.Supp. 1343 (N.D. Cal. 1995)....................................................................27, 29, 33

*Moden v. U.S. Fish & Wildlife Serv.*,
281 F. Supp. 2d 1193 (D. Or. 2003).................................................................... 20, 21

*Natural Resources Defense Council v. Kempthorne*,
506 F.Supp.2d 322 (E.D. Cal. 2007)...........................................................................28

*Nat'l Wildlife Fed'n v. Burlington N.R.R., Inc.*,
23 F.3d 1508 & n. 4 (9th Cir.1994)...........................................................................17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
422 F.3d 782 (9th Cir.2005)..............................................................................31, 32

*NRDC v. Kempthorne*,
539 F. Supp. 2d 1155 (E.D. Cal. 2008)..........................................................19

*NW. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
817 F.Supp.2d 1290 (D.Or.2011) ...................................................................31

*NWF v. NMFS*,
422 F.3d 782 (9th Cir.2005) ...........................................................................32

*Oregon Natural Desert Ass'n v. Tidwell*,
No. 07-1871-HA, (March 16, 2011) (D. Or.) ...............................................18

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
606 F.Supp.2d 1195 (E.D.Cal.2008)..............................................................31

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
766 F.2d 1319 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985) ............35

*South Yuba River Citizens League v. NMFS*,
No. 06-2845-LKK-JFM, 2007 WL 3034887 at *8 (E.D. Cal. Oct. 16, 2007)............19

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998).........................................................................................22

*Tennessee Valley Auth. v. Hill*,
437 U.S. 153 (1978)...................................................................................17, 33

*United States v. Oakland Cannabis Buyers' Cooperative*,
532 U.S. 483 (2001).......................................................................................18

*U.S. v. West Coast Resources LP*,
2000 WL 298707 (D. Or. 2000)......................................................................25

*Western Watersheds Project v. Kraayenbrink*,
2007 WL 952013 (D. Idaho March 27, 2007) ...............................................19

*Wild Equity Institute v. City and Cnty. of San Francisco*,
No. C 11–00958 SI, 2011 WL 5975029, (N.D.Cal. Nov. 29, 2011) ............31

*Winter v. Natural Res. Def. Council*
555 U.S. 7 (2008)................................................................................17, 18, 31

**STATUTES**

16 U.S.C. § 1531.................................................................................................1

16 U.S.C. § 1532...............................................................................................24

16 U.S.C. § 1536...............................................................................................34

16 U.S.C. § 1538...............................................................................................24

16 U.S.C. § 1540...................................................................................... 18, 19, 20, 21

**FEDERAL REGULATIONS**

50 C.F.R. § 17.3...........................................................................................24, 25

**OTHER AUTHORITIES**

40 Fed. Reg. 44412..........................................................................................25

46 Fed. Reg. 54750..........................................................................................25

75 Fed. Reg. 3425..............................................................................................8

81 Fed. Reg. 51348............................................................................................7

https://www.cascwild.org/press-release-lawsuit-filed-to-protect-threatened-marbled-murrelet-from-logging-on-former-elliott-state-forest/.

https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=B08C#crithab.

http://www.resolv.org/site-collaborativescience/issue-areas/endangered-species/northern-spotted-owl/editorial/

I.    INTRODUCTION

Plaintiffs seek to enjoin Defendants from harvesting timber from 49 acres of land Scott Timber Co. owns in Coos County, Oregon—the "Benson Snake Unit."  Plaintiffs allege that the 49-acre Benson Snake Unit is "occupied" by marbled murrelets, a species listed as threatened under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq,* and that harvesting timber from the unit will disrupt "the birds' essential behavioral patterns to such an extent as to cause 'take' under the ESA."  Dkt. No. 2-1 at 5.  In support of this claim, Plaintiffs rely upon the alleged observation of a pair of marbled murrelets flying east-to-west across a portion of the harvest unit at "0.8 canopy height" in 2014 by Clark McMahon.  This single isolated observation does not support Plaintiffs' contention that harvesting the Benson Snake Unit will cause a "take" of individual marbled murrelets, much less that it would cause irreparable harm to the species.  As explained below, the harvest is planned in a stand that is not used by marbled murrelets for nesting, a determination supported by the best available science and data.  *See* Declaration of Steven P. Courtney.  Further, the harvest is going to take place during the non-nesting season, while marbled murrelets are at sea, to avoid the possibility of direct interaction with the bird during the breeding season.  *See id.*; see Declaration of Scott Folk.

Plaintiffs threatened to sue Scott Timber Co. in 2014, more than two years before Scott Timber Co. ever made plans to harvest from the tract.  In anticipation of litigation, Scott Timber Co., in conjunction with its counsel, hired an independent team of scientists from an internationally-recognized consulting firm, Western Ecosystems Technology, Inc. ("WEST"), to investigate Plaintiffs' allegations pertaining to possible marbled murrelet use of the tract.  *See* Folk Decl.  Scott Timber Co.'s scientific consultants, led by marbled murrelet expert Dr. Steven P. Courtney, recommended a study design and WEST carried out that study during the 2015 and 2016

Page **1 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

marbled murrelet nesting seasons. *See* Courtney Decl.; Declaration of Joel L. Thompson. Based on the results of the study, WEST provided Scott Timber Co. and its counsel with a determination that the stand within which the 49-acre Benson Snake Unit is located was not used by marbled murrelets for nesting in 2015 or 2016. Due to the lack of nesting in 2015 and 2016, and a variety of additional data, published research, biological information and other relevant factors, WEST concluded that the area is not used by marbled murrelets for nesting. *See* Courtney Decl. at ¶¶ 20, 21-22. Based on these scientific determinations, Scott Timber Co. designed the 49-acre Benson Snake Unit for a regeneration harvest specifically to avoid marbled murrelet nesting sites. Folk Decl. at ¶ 9. The harvest will be conducted during the non-nesting season (September through March), while marbled murrelets are at sea, to avoid direct interaction with the bird while harvest operations take place. *Id.*; Courtney Decl. at ¶ 22.

Plaintiffs' lawsuit challenging Scott Timber Co.'s harvest plans under Section 9 of the ESA is without merit and their instant motion for a preliminary injunction should be denied for five principal reasons. **First**, the Court lacks jurisdiction because Plaintiffs have not complied with the 60-day notice requirement imposed by 16 U.S.C. 1540(g)(2)(A). **Second**, Plaintiffs lack standing to challenge Defendants' planned timber harvest because they lack legal access to the Benson Snake Unit to observe marbled murrelets and, further, because Plaintiffs have failed to demonstrate that harvesting the Benson Snake Unit would diminish their ability to observe or experience marbled murrelets on lands they can legally access, such as the Elliott State Forest. **Third**, even if Plaintiffs had standing, Plaintiffs are not likely to succeed on the merits because the WEST study demonstrates that the Benson Snake Unit is not used by marbled murrelets for nesting and, further, that harvesting the Benson Snake Unit will not significantly impair the breeding of marbled murrelets in adjacent occupied sites. Courtney Decl. at ¶¶ 20, 21-22. **Fourth**, Plaintiffs have not

demonstrated irreparable harm to the species as a whole; alternatively, nor have Plaintiffs demonstrated irreparable harm to marbled murrelets that nest in forest stands within the Elliott State Forest and Central Oregon Coast region.  Contrary to Plaintiffs' contentions, the best and most recent available science indicates that marbled murrelets along the Oregon Coast, including the Central Coast Region have been stable over the last 10-plus years, *id.* at ¶ 23, and Plaintiffs provide no evidence demonstrating that Scott Timber Co.'s harvest of the 49-acre Benson Snake Tract would affect that trend.  **Fifth**, an injunction would not be in the public interest, and the balance of harms do not favor Plaintiffs, because issuing an injunction under these circumstances would discourage private parties from investing in the study, protection and conservation of threatened and endangered wildlife species.

Defendants respectfully submit the Court should deny Plaintiffs' motion.

## II.    FACTUAL BACKGROUND

### A.  Prior Litigation.

Defendants find themselves caught up in the latest chapter of the Plaintiffs' dispute with the State Land Board's administration of its constitutionally-mandated fiduciary obligation to manage or dispose of the Elliott State Forest for the generation of revenue for the State's Common School Fund.  Although they characterize this lawsuit as an attempt to protect marbled murrelets that allegedly nest in the Benson Snake Unit, in reality, Plaintiffs' primary objective is to interfere

with the State Land Board's recent decision to sell the Elliott State Forest.[1]  A long procedural history precedes Plaintiffs' latest tactic.

In 2008, two of the Plaintiffs of this action filed a lawsuit against the U.S. Fish and Wildlife Service challenging the sufficiency of a Habitat Conservation Plan ("HCP") that formerly covered the Elliott State Forest.  *See Ctr. for Biological Diversity v. Henson*, No. CIV. 08-946-TC, 2009 WL 1882827 (D. Or. June 30, 2009).  In 2012, Plaintiffs filed an action against State of Oregon officials alleging that their timber harvest activities violated Section 9 of the ESA and criticizing them for not renewing an HCP with the Service.  *See Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1078 (D. Or. 2012).  In response to the lawsuit, the State officials chose to voluntarily cancel numerous timber sales, resulting in a stipulated dismissal of the action.  The State's cancellation of the timber sales and changes in management policy led to a $3 million operating loss to the State's Common School Fund and the Department of State Lands predicted that similar losses were expected in the future.  Declaration of Christopher T. Griffith, Exhibit 112. To comply with its fiduciary responsibilities to the Common School Fund, in 2013, the State Land Board offered for sale three tracts of the Elliott State Forest to help determine market value and inform future management or disposal options for the forest.  *Id.*

---

[1] One of Plaintiffs' attorneys of record, Nick Cady, provided the following comment about this lawsuit in a press release: "This unfortunate situation should send a clear message to Governor Kate Brown, Treasurer Ted Wheeler and Secretary of State Jeanne Atkins that further privatization of the Elliott will directly threaten imperiled salmon and wildlife, old-growth forests, recreation opportunities and other values that Oregonians hold dear.  Our leaders in Salem must stand up for Oregonians, and halt the ongoing privatization of the Elliott State Forest." *See* https://www.cascwild.org/press-release-lawsuit-filed-to-protect-threatened-marbled-murrelet-from-logging-on-former-elliott-state-forest/.  In addition, Coast Range Forest Watch, the group taking credit for conducting surveys of the Benson Ridge Tract in 2014, has strenuously advocated against the State Land Board's transfer of the Elliott State Forest, as well as against timber harvest on the Elliott State Forest. *See* Declaration of Christopher T. Griffith, Exhibit 116; *cf.* Dkt. No. 2-2 (Declaration of Max Beeken).

Page **4 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Following the State Land Board's decision to sell the three tracts but prior to bids becoming due, on or around March 13, 2014, Plaintiffs sent a letter to Scott Timber Co. and eighteen other companies in the forest products industry advising them that Plaintiffs intended to commence an action under the ESA against any forest products company that might purchase any of the three tracts.  Folk Decl., Exhibit 106.  Following the March 13, 2014 letter, Scott Timber Co. received another letter on or around March 20, 2014 from a group calling itself Cascadia Forest Defenders. This letter stated that if the parcels on the Elliott State Forest were sold to private parties "[w]e will not respect new property lines, signs and gates. […] Do not bid on these sales. If you become the owner of the Elliott, you will have activists up your trees and lawsuits on your desk. We will be at your office and in your mills." *Id.*, Exhibit 107.

Undeterred by the threats and attempted interferences with the land sale, Scott Timber Co. bid on, and purchased, two of the three tracts including the Benson Ridge Tract at issue in this case.  Following the closing of the land sales, Plaintiffs sent Scott Timber Co. a letter on June 3, 2014 purporting to provide 60-day notice of Plaintiffs' intent to sue Scott Timber Co. under the ESA for alleged unlawful take of marbled murrelets.[2]  *Id.*, Exhibit 108.  Max Beeken, one of Plaintiffs' declarants, provided Scott Timber Co. with data sheets for surveys that were allegedly conducted in 2014, immediately prior to the closing of the sale.  *Id.* at ¶ 6.  Mr. Beeken alleged that a surveyor observed a single pair of marbled murrelets flying across the tract at 0.8 canopy height.  *Id.*, Exhibit 109.  That same observation forms the basis for this lawsuit.

---

[2] Plaintiffs also challenged the land sale of a third tract to Seneca Jones Timber Company in a lawsuit filed in Lane County Circuit Court.  *Cascadia Wildlands et al. v. Department of State Lands*, Case No. 62 140 7847 (Lane County Circuit Court).  Plaintiffs' challenge was dismissed by Judge Rasmussen and Plaintiffs' appeal remains pending. *Cascadia Wildlands et al. v. Department of State Lands*, CA A159061 (Oregon Court of Appeals).

Page **5 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Scott Timber Co. responded to Plaintiffs' June 3, 2014 letter by advising that the company had no concrete or imminent plans to conduct timber harvest operations on the Benson Ridge Tract. Folk Decl., Exhibit 110. The company further advised that "any future decisions would only be made after undertaking significant surveying and planning work, including investigation and planning relating to species listed under the Endangered Species Act." *Id.*

In anticipation that Plaintiffs would sue, Scott Timber Co., in conjunction with its counsel, hired an independent team of scientists (WEST) to investigate the allegations made in Plaintiffs' 60-day notice letter, to assess legal risks, to help inform the company's development of forest management objectives and to prepare for anticipated litigation. *Id.* at ¶ 8. It was only after WEST studied murrelet use of the tract for two nesting seasons (in 2015 and 2016), that Scott Timber Co. decided to design and execute a timber harvest unit. *Id.* at ¶ 9. Scott Timber Co. planned the Benson Snake Unit to avoid marbled murrelet nesting sites, as determined by WEST. *Id.* Based on WEST's advice, Scott Timber Co. also decided to conduct harvest operations outside of the marbled murrelet nesting season to avoid direct interaction with birds that may use adjacent nesting sites during the nesting season. *Id.*; Courtney Decl. at ¶ 22.

### B. The Elliott State Forest.

Neither the Elliott State Forest, nor the Benson Snake Unit, consist of old growth stands. The Coos Bay Fire of 1868 burned 90 percent of the area that is now the Elliott State Forest. The fire is believed to have started near Scottsburg and burned southwest, not stopping until it reached the sand and water of Coos Bay. Griffith Decl., Exhibit 115. Although some remnant old growth trees survived, the mature standing inventory primarily consists of second growth timber that regenerated following the fire. In 1915, around the time the State of Oregon began looking at acquiring the Elliott State Forest from the United States as indemnity for unavailable school

sections, the effects of the fire were still plainly evident with young regrowth sprouting up among

dead snags.  Griffith Decl., Exhibit 114; see Figure 1, below.



Elliott State Forest, 1915

**Figure 1.**  Excerpt from the Twenty-fifth Annual Report of the State Forester (1935) (Griffith Decl., Exhibit 114).

As of 2011, approximately 44,000 acres of the Elliott State Forest contained timber of 80 years of

age or older.  *Id.*, Exhibit 115.  The timber within the Benson Snake Unit is approximately 127

years old.  Thompson Decl. at ¶ 9; *id.*, Exhibit 105.  The Benson Ridge Tract is not designated as

critical habitat for marbled murrelets by the U.S. Fish and Wildlife Service.[3]

Due to the financial drain of the Elliott State Forest on the Common School Fund, described

above in Part II.A., on August 8, 2015, Governor Kate Brown signed a resolution and order

---

[3] Mapping of marbled murrelet critical habitat can be accessed at the following website: https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=B08C#crithab. *See also* 81 Fed. Reg. 51348.

Page **7 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

directing the Department of State Lands to pursue a transfer of the Elliott State Forest by a direct sale based on an estimate of its value. Griffith Decl., Exhibit 113. Governor Brown required that any proposal to buy the forest include commitments, with enforcement mechanisms, to protect "enhanced public benefits" including: "[c]onserving older forest stands by protecting from harvest at least 25% of the acreage." *Ibid.* As of 2010, the Oregon Department of Forestry had set aside 11,500 acres as Marbled Murrelet Management Areas (reserves) in the Elliott State Forest. *Id.*, Exhibit 115. Thus, it can reasonably be expected that the Elliott State Forest will continue to provide substantial habitat for marbled murrelets into the future, despite the fact that is not listed as critical habitat by the U.S. Fish and Wildlife Service.

## C.  Marbled Murrelets.

Marbled murrelets are small seabirds that occur from Alaska to Northern California. In 1992, the U.S. Fish and Wildlife Service listed marbled murrelets in Washington, Oregon and California as a Distinct Population Segment ("DPS") warranting listing under the ESA as threatened. 75 Fed. Reg. 3425.

Although populations in Washington have declined over the last thirteen years, marbled murrelets in Oregon and California have not. Courtney Decl. at ¶ 23. The most recent data indicates marbled murrelet populations have remained stable in Oregon over the last thirteen years (2000-2013). *Id.* (see Figure 2, below). In fact, the best available science suggests a slight increase in marbled murrelet populations along the Oregon Coast from the Columbia River to Coos Bay (Conservation Zone 3), where the Benson Ridge Tract is located, with a total estimated population of 7,780 birds. *Id.* Further, of the 7,880 birds in Zone 3, the highest density of those birds are found along the Central Oregon Coast, between Newport and Coos Bay. *Id.* (see Figure 2). The Benson Ridge Tract is located between Reedsport and Coos Bay.

Page **8 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**



**Figure 2:** population trend of Zone 3 (above) and average marbled murrelet densities at sea (right), 2000-2013 (reproduced from Falxa and Raphael, 2016). *See* Courtney Decl. at ¶ 23.

### D.  The Benson Ridge Marbled Murrelet Study.

Due in part to Plaintiffs' threat to sue Scott Timber Co., both preceding and immediately following the company's acquisition of the Benson Ridge Tract, Scott Timber Co. decided, in conjunction with its counsel, to hire WEST to conduct an independent study of the tract to investigate Plaintiffs' allegations and provide data and opinions on marbled murrelet use of the tract based on the best available science.  Folk Decl. at ¶¶ 8-9; Courtney Decl. at ¶ 7.

WEST's team was led by Dr. Courtney, a PhD scientist with decades of experience studying and publishing research on marbled murrelets and a variety of other sensitive species, including spotted owls.  Courtney Decl. at ¶¶ 2-4.  His expertise and independence has been recognized by the U.S. Fish and Wildlife Service in choosing him to conduct independent scientific

reviews on controversial scientific topics, including ESA decisions. *Id.* He has held a nation-wide contract with the Service for independent peer review since 1998. *Id.* In 2007, after Dr. Courtney was selected by the U.S. Fish and Wildlife Service to lead an independent science review for the spotted owl recovery plan, the Oregonian's Editorial Board commented that "Courtney could be the perfect choice. He owes no allegiance to the government, the timber industry or environmental interest groups. He has done extensive research on the spotted owl. And his nonprofit group, a network of more than 300 scientists across the country has a solid reputation for mediating environmental disputes using an open, transparent process."[4]

Dr. Courtney, in conjunction with WEST research biologist Joel Thompson, specified an intensive study design intended to maximize the amount of information about murrelet use on the entire Benson Ridge Tract, as well as adjacent potentially suitable habitat within a quarter mile of the legal boundary of the tract (in this case, land owned by the State of Oregon). Courtney Decl. at ¶ 17; Thompson Decl. at ¶ 7. Dr. Courtney's intent with this approach was to gather survey data for two years and then make habitat use delineations based on a totality of the evidence and information available. Courtney Decl. at ¶ 17. Only after those delineations were determined would Scott Timber Co. decide what, if any, areas to harvest. *Id.*

As Dr. Courtney explains in his declaration, the study design was based on recommendations from a survey protocol developed by the Pacific Seabird Group (PSG) that was last revised in 2003. *Id.* The 2003 PSG Protocol has the stated-objectives of providing biologists, forest managers and researchers a method for: (1) documenting the occurrence or probable absence

---

[4] The article can be found at the following website: http://www.resolv.org/site-collaborativescience/issue-areas/endangered-species/northern-spotted-owl/editorial/ (last accessed September 21, 2016).

of murrelets in a forest at the time of surveys; (2) interpreting the biological significance of behaviors observed during surveys to evaluate how murrelets are using forests; (3) identifying the geographic distribution of the Marbled Murrelet; and (4) providing consistency in surveys among land managers.  Thompson Decl. at ¶ 6.  Specifically, the 2003 PSG Protocol provides a set of procedures and guidelines for (1) identifying potential murrelet nesting habitat; (2) establishing survey areas, survey sites and survey stations; (3) carrying out surveys; and (4) interpreting survey data for site classification purposes.  *Id.*

Although the 2003 PSG Protocol has not been subjected to a formal peer-review process that would be required of a scientific publication, nor has it been formally adopted by the U.S. Fish and Wildlife Service, Courtney Decl. at ¶ 10, the protocol's recommended study design and procedures for carrying out audio-visual surveys are, generally, scientifically reasonable for fulfilling the limited purpose of ***documenting observations*** of marbled murrelet use of a specific forest stand at the time the surveys are conducted.  *Id.* at ¶ 11.  However, on the other hand, the 2003 PSG Protocol's recommendations for ***interpreting*** the significance and meaning of survey data are, in some cases, based on un-validated assumptions, as well as controverted by research that post-dates the 2003 revision of the protocol.  *Id.* at ¶¶ 12-16.  As a result, if the goal of the land manager is to delineate specific sites where murrelets are likely nesting versus specific sites in the contiguous forest where murrelets are unlikely to be nesting, the PSG Protocol site classification recommendations do not serve that purpose.  *Id.* at ¶ 13.

For instance, the basic premise of the 2003 PSG Protocol is that the observation of a bird (or birds) flying beneath the canopy of a forest stand is an indication that the bird that was observed was traveling to a nest located in proximity to the observer.  *Id.* at ¶ 12.  However, there are numerous circumstances under which a bird may be observed flying beneath the canopy and not

be in proximity to a nest, some of which the protocol recognizes but does not directly account for in its guidelines and recommendations. *Id.* Nothing in the 2003 PSG Protocol precludes a qualified expert such as Dr. Courtney from interpreting the significance of observations of marbled murrelets based on the totality of the best scientific data and information available (e.g., number and kinds of detections, flight paths, topography, site-specific forest stand characteristics, observational data from adjacent drainages, published research, etc.). *See* Courtney Decl. at ¶ 14; *id.* at 16.

Further, the 2003 PSG Protocol recommends that land managers extrapolate data from one survey site (which can be as large as 150 acres in size) to adjacent survey sites that contain contiguous potentially suitable nesting habitat, even where no significant observations of marbled murrelets are observed in the adjacent site. *Id.* at ¶ 13. The PSG's express justification for this extrapolation of the data from one site to another site is a "hypothesis that continuous habitat is important" for marbled murrelets. *Id.*[5] However, as explained by Dr. Courtney, published research (Zharikov et al. 2006) that postdates the last revision of the PSG Protocol directly controverts that hypothesis. *Id.* at ¶¶ 15, 20. The researchers concluded that their results did not support the PSG's hypothesis that marbled murrelets prefer larger old-growth patches for nesting. *Id.* at ¶ 15. The researchers further concluded that "patch size is neither a consistent nor an important nesting habitat predictor in this species." *Id.* The Zharikov 2006 research is one of the only studies to have ever been conducted where marbled murrelets and actual nests were tracked by radio telemetry and helicopter. *Id.* The researchers compared nesting preferences and nesting success in two different landscapes, one that had been heavily logged and one that consisted of relatively

---

[5] A hypothesis is "an idea or theory that is not proven but that leads to further study or discussion." http://www.merriam-webster.com/dictionary/hypothesis.

intact old growth. *Id.* The researchers found that marbled murrelets successfully nested in the heavily-logged landscape in patch sizes averaging as small as 24.7 acres. *Ibid.*

In a recent comprehensive Scientific Evidence Review commissioned by the Oregon Department of Forestry, a panel of scientists rated the Zharikov 2006 publication among the highest of any publication currently available on marbled murrelets (Plissner et al. 2015). *Id.* at ¶ 15. The PSG Protocol has not revised its recommendations regarding survey data interpretation to reflect the best available science, such as that reflected by the Zharikov 2006 publication. *Id.* at ¶¶ 15, 20.

With these principles in mind, WEST sought to design an audio-visual study of marbled murrelet use for the Benson Ridge Tract in conformance with PSG recommendations and guidelines for establishing survey areas, survey sites, survey stations, timing of surveys and frequency of surveys. *Id.* at ¶ 17. However, instead of establishing a study design based on a pre-determined harvest or treatment unit, WEST recommended and established a more intensive study design intended to maximize the amount of information about murrelets' use on the entire tract, as well as adjacent potentially suitable habitat within a quarter mile of the legal boundary of the tract. *Id.* at ¶ 17; Thompson Decl. at ¶ 7. The intent of this approach was to gather survey data for two years and then make habitat use delineations based a totality of the evidence available. Courtney Decl. at ¶ 17. Only after those delineations were determined would Scott Timber Co. decide what, if any, areas to harvest. *Id.*; Folk Decl. at ¶¶ 8-9. This is a different approach than what is anticipated by the PSG Protocol—which assumes that a land manager will first select an area for harvest and then provides recommendations for designing a survey study around the harvest unit. Thompson Decl. at ¶ 7.

Page **13 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

As explained by Mr. Thompson, the study area for the area containing the Benson Snake Unit was called the Benson South Survey Area, which was in turn split into three separate survey sites separated by primary ridge lines. *Id.* at ¶ 9, Exhibit 102 and 103. The Benson Snake Unit is located within the survey site called Benson Central. *Ibid*; see Figure 4, below.



**Figure 4:** showing the three survey sites constituting the Benson South Survey Area: Benson Ridge West; Benson Ridge Central and Benson Ridge Southeast. A primary ridge separates the Benson Ridge Central site from the Benson Ridge Southeast site. A primary ridge and mainline road separate the Benson Ridge Central site from the Benson Ridge West site. *See* Thompson Decl. at ¶ 9-10. For larger image, *see id.*, Exhibit 102.

In 2015, no indicators of marbled murrelet nesting was observed in the entire Benson South Survey Area, leading both Dr. Courtney and Mr. Thompson to conclude that it was not used by marbled murrelets for nesting in 2015. Courtney Decl. at ¶¶ 18-20; Thompson Decl. at ¶ 13. In 2016, indicators of marbled murrelet nesting were not observed in the Benson Ridge Central

survey site, where the Benson Snake Unit is located.  Thompson Decl. at ¶ 16.  However, significant numbers of sub-canopy detections were made in the Benson West Survey Site and in the Benson Southeast Survey Site.  *Id.* at ¶¶ 14-15; Courtney Decl. at ¶ 17-18.  Extra surveys were performed to confirm nesting use.  *Ibid.*  Based on the totality of the evidence, Dr. Courtney's opinion is that it is likely that the Benson West and Benson Southeast survey sites were being used by marbled murrelets for nesting in 2016.  Courtney Decl. at ¶ 18. Further, based on the number of detections in Benson Southeast that were focused specifically on a specific survey station, BR 23, including the perception of the observer of an apparent landing, Dr. Courtney believes that the specific BR 23 station (located on land owned by the State of Oregon) represents a specific site that is used for marbled murrelet nesting. *Id.* at ¶ 19.

In contrast to the Benson Ridge West and Southeast survey sites, no sub-canopy detections were made in the Benson Central Survey Site in 2015 or 2016, which is where the Benson Snake Unit is located.  Thompson Decl. at ¶ 16.  Based on these results, WEST concluded that the stand was not used for nesting by marbled murrelets in 2015 or 2016.  *Id.*; Courtney Decl. at ¶¶ 20-21. In addition, in Dr. Courtney's opinion, based on the totality of the evidence and data available (including the alleged 2014 observation by Mr. McMahon), the habitat within the Benson Central site is not used by marbled murrelets for nesting.  *Id.*

Further, Dr. Courtney explains that the PSG Protocol's recommendation that the Benson Central nevertheless be classified as "occupied" based on the nesting use in the separate, adjacent drainages of the Benson West and Benson Southeast survey sites is not supported by the totality of the evidence, nor the best available science.  Courtney Decl. at ¶ 20.  Finally, if the Benson Snake Unit is harvested outside of the nesting season, in Dr. Courtney's opinion, the harvest will

not significantly alter or disturb murrelets' preference for nesting, or ability to nest, in the adjacent Benson West or Benson Southeast survey sites.  *Id.* at ¶ 22.

Based on the information and determinations provided by WEST, Scott Timber Co. decided to design and execute a timber harvest within a portion of the Benson Central site—the Benson Snake Unit.  Folk Decl. at ¶ 9; *see* Figure 5, below.



**Figure 5:** Survey stations with sub-canopy murrelet detections recorded during 2015 and 2016 surveys at Benson Ridge. The Benson Snake Unit is delineated in crosshatching.  For a larger image, *see* Thompson Decl., Exhibit 104.

Scott Timber Co. and its team designed the unit specifically to avoid marbled murrelet nesting sites, as determined by WEST.[6]

In early September, during road building activities for the Benson Snake Unit, an excavator being used on the project was vandalized on site, causing major engine damage. Folk Decl. at ¶ 9. The road building is now approximately one week away from being complete. *Id.* Scott Timber Co. needs to be able to commence harvest operations by mid-November in order to finish the operations before the start of the marbled murrelet nesting season in April 2017. *Id.*

## III.    STANDARD FOR PRELMINARY INJUNCTION

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). "[C]ourts are not obligated to grant an injunction for every violation of the law." *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 & n. 4 (9th Cir.1994) ("*NWF v. Burlington N.*") (citation omitted). Accordingly, Plaintiffs seeking a preliminary injunction must show more than a likelihood of success on the merits; they must also show that they are likely to suffer irreparable harm, that the balance of equities tips in their favor and that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Defendants recognize that, in *NWF v. Burlington N.*, the Ninth Circuit indicated that the ESA "removed from the courts their traditional equitable discretion in injunction proceedings" and determined that "the balance of hardships and the public interest tips heavily in favor of protected species." 23 F.3d at 1510-11 (relying on *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978)).

---

[6] As explained in Mr. Folk's declaration, the timber management activities on the Benson Ridge Tract have been directed, and are under the control of, Scott Timber Co. and Roseburg Resources Co. Defendant Roseburg Forest Products Co. does not direct, or have control over, the timber management activities occurring on lands owned by Scott Timber Co. Folk Decl. at ¶ 10.

Page **17 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

However, the Ninth Circuit's 1994 interpretation of *TVA v. Hill* in *NWF v. Burlington N.* conflicts with the Supreme Court's decision in *Winter* and other Supreme Court precedents, which make it clear that all four factors must be applied. *See, e.g., Animal Welfare Inst. v. Martin*, 623 F.3d 19, 27 (1st Cir. 2010) ("The Supreme Court has since explained that the drastic result in *Hill* stemmed from the strong and undisputed showing of irreparable harm that would occur absent an injunction: an entire species would become extinct."), *citing United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 496–98 (2001).

Further, this Court has in at least two cases considered competing harms and the public interest in limiting and denying preliminary injunctions in ESA Section 9 contexts. *See Oregon Natural Desert Ass'n v. Tidwell*, No. 07-1871-HA, Order Modifying Injunction (March 16, 2011) (D. Or.) ("[t]his modified Order seeks an equitable balance between protecting the species, allowing some grazing privileges for permittees, and compelling the Forest Service to comply with its responsibilities"); *Center for Biological Diversity v. U.S. Bureau of Reclamation*, No. 6:15-cv-02358, Opinion and Order (April 4, 2016) (D. Or.) ("[e]ven if plaintiffs' established a likelihood of success on their ESA claims and some degree of irreparable harm[,] plaintiffs fail to show that the balance of hardships tips in their favor and serves the public interest"). Therefore, there is no presumption of an entitlement to an injunction for every alleged violation of the ESA; Plaintiffs have a burden to demonstrate entitlement to a preliminary injunction under all four *Winter* factors.

## IV.    ARGUMENT

### A.  Plaintiffs Have Not Provided a Valid 60-Day Notice.

Plaintiffs bring this action exclusively under 16 U.S.C. § 1540(g)(1)(A), the ESA's citizen suit provision. Dkt. No. 1 at ¶ 6. However, that statute provides that "No action may be commenced […]  prior to sixty days after written notice of the violation has been given to the

Secretary, and to any alleged violator of any such provision or regulation[.]"    16 U.S.C. § 1540(g)(2)(A)(i).  Here, Plaintiffs rely on a letter they sent more than two years ago, in 2014, long before the Scott Timber Co. ever planned and began executing the harvest plan for the Benson Snake Unit.  Folk Decl. at ¶ 9; *cf.* Dkt. No. 1 at ¶ 7.  That notice letter did not provide valid or sufficient notice of the alleged "violation" for the purposes of complying with 16 U.S.C. § 1540(g)(2)(A).  Therefore, the Court lacks jurisdiction over this case and Plaintiffs' motion for a preliminary injunction motion should be denied, as this case should be dismissed.

Citizen suit provisions balance the benefits of encouraging citizen enforcement with avoiding excessive suits "by 'allow[ing] Government agencies to take responsibility for enforcing environmental regulations,' and 'giv[ing] the alleged violator an opportunity to bring itself into complete compliance with the Act.'"  *Alliance for the Wild Rockies v. U.S. Dept. of Agriculture,* 772 F.3d 592, 603 (9th Cir. 2014), *quoting Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989).  The 60-day notice requirement "is not simply a desideratum; it is a jurisdictional necessity." *Center for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2008) (discussing the Clean Water Act's similar 60-day notice provision).   Further, courts have consistently held that a party cannot provide "prospective" or "anticipatory" notice of a violation; instead, a notice is only effective if given after the date of the action challenged. *Western Watersheds Project v. Kraayenbrink*, 2007 WL 952013 (D. Idaho March 27, 2007) ("Likewise, a notice letter that attempts to apply to future agency action not yet taken is insufficient"); *American Rivers v. NMFS*, 109 F.3d 1484 (9th Cir. 1997), *amended and superseded by American Rivers v. NMFS*, 126 F.3d 1118 (9th Cir. 1997); *NRDC v. Kempthorne*, 539 F. Supp. 2d 1155,1179 (E.D. Cal. 2008); *Kern County Farm Bureau v. Badgley*, No. 02-5376-AWI-DLB, 2002 WL 34236869 at *11 (E.D. Cal. Oct. 10, 2002); *South Yuba River Citizens League v. NMFS*, No. 06-2845-LKK-

JFM, 2007 WL 3034887 at *8 (E.D. Cal. Oct. 16, 2007).  Plaintiff's purported notice letter in 2014 fails to meet these standards because, at that time, the Benson Snake project had not been planned, much less initiated.

In their June 4, 2014 letter to Scott Timber Co., Plaintiffs alleged that "logging in occupied or suitable nesting habitat for marbled murrelets in any of these parcels violates the [ESA.]" Folk Decl., Exhibit 108.    Plaintiffs indicated their intention to commence litigation to "obtain an injunction … to prevent you from logging in suitable or occupied marbled murrelet habitat…." *Id.* However, as the company subsequently informed Plaintiffs, Scott Timber Co. had no concrete or imminent plans to conduct timber harvest on the Benson Ridge Tract in 2014.  *Id.*, Exhibit 110. Those plans were not developed and finalized until 2016, after two years of murrelet study and assessment by WEST.  *Id.* at ¶ 9.  As a result, there was no ripe action or project for Plaintiffs to pursue as an alleged "violation" for the purpose of 16 U.S.C. § 1540(g)(2)(A), which requires that notice be given to the Secretary "of the violation."  Plaintiffs ostensibly agreed with that premise because they did not file a lawsuit based on the 2014 notice letter to obtain the injunction they threatened to seek.  Instead, they chose file a lawsuit based on the Benson Snake project but without first complying with the "jurisdictional necessity" of providing a 60-day notice. *CBD v. Marina Point Dev. Co.*, 566 F.3d at 800.

Plaintiffs' sole cause of action in this lawsuit is a challenge to the Benson Snake project. *See* Dkt. No. 1 at ¶ 85.  Therefore, "the violation" they seek to challenge is Scott Timber Co.'s plans to harvest the Benson Snake Unit.  Because that project was just recently planned and initiated in 2016, Folk Decl. at ¶ 9, Plaintiffs' 2014 letter did not, and could not have, provided notice for this lawsuit.  *See also* Dkt. No. 2-1 at 15 (explaining that Scott Timber Co.'s notification of intent to harvest was filed with the State of Oregon on August 13, 2016).

Page **20 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

This case is similar to this Court's decision in *Moden v. U.S. Fish & Wildlife Serv.*, 281 F. Supp. 2d 1193, 1206 (D. Or. 2003), decided under the ESA's parallel notice provision at Section 1540(g)(2)(C).  In that case, interested parties brought a lawsuit seeking the "de-listing" of Lost River and shortnose sucker fishes.  Prior to filing the lawsuit, the plaintiffs had filed a petition to delist the species with the U.S. Fish and Wildlife Service.  They stated in their delisting petition that "[t]his letter also constitutes notice pursuant to 16 U.S.C. § 1540(g), of the intent of the petitioners to pursue any and all legal remedies available to them under the Act or otherwise to compel your faithful discharge of your duty to remove these 'species' from the list." However, at the time plaintiffs provided defendants with the notice, the agency had not yet considered the petition to delist. Therefore, Judge Jones concluded, "because the agency had not acted on the petition at the time of notice, <u>plaintiffs could not have given the Secretary notice of an unlawful action</u>." *Id.* at 1205-1206 (emphasis added).

The Court should reach the same conclusion here.  Because Scott Timber Co. had not yet developed a timber harvest plan at the time of Plaintiffs' 2014 notice letter, Plaintiffs "could not have given the Secretary notice" of "the violation" pursuant to Section 1540(g)(2)(A).  *Moden*, 281 F. Supp. 2d at 1205-1206.

There are compelling policy reasons for reaching this conclusion as well.  As explained by the Supreme Court in *Bennett v. Spear*, the purpose of the notice requirement is to provide a "reservation to the Government of a right of first refusal to pursue the action initially and a right to intervene later." *Bennett v. Spear*, 520 U.S. 154, 165 (1997).  Thus, Congress designed the ESA such that, if a citizen believes a violation has occurred or will imminently occur as a result of an authorized or initiated activity, the Government has the first right to determine whether to pursue an action against the alleged violator.  Similarly, the Government has the first prerogative to

Page **21 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

determine whether an emergency exists warranting a request for a preliminary injunction. In addition, it provides the alleged violator an opportunity try to resolve the alleged violation with the Secretary and/or the putative plaintiff. Here, allowing Plaintiffs to proceed based on the 2014 notice would deny Defendants the opportunity to resolve any concerns the U.S. Fish and Wildlife Service might have with the harvest plan for the Benson Snake Unit, as well as WEST's study and Dr. Courtney's scientific assessments and determinations.

Due to Plaintiffs' failure to comply with the ESA's pre-suit notice requirement, this Court lacks jurisdiction and Plaintiffs' motion for a preliminary injunction should be denied.

### B. Plaintiffs Lack Standing.

In order for Plaintiffs to invoke this Court's jurisdiction, they also have the burden to demonstrate that they have standing to challenge Scott Timber Co.'s plan to harvest the 49-acre Benson Snake Unit. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The "irreducible constitutional minimum of standing" requires the party invoking the court's jurisdiction to demonstrate that: (1) he or she suffered an "injury in fact"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and 3) "it must be likely ... that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and internal quotations omitted). Here, Plaintiffs have failed to demonstrate an injury in fact that is fairly traceable to Scott Timber Co.'s planned timber harvest.

Although Plaintiffs do not address standing in their motion, they rely on the declarations of David Noah Greenwald, Francis Eatherington and Max Beeken in support of their argument that they will suffer irreparable harm in the absence of an injunction. They allege to "have very real and substantial concerns that the logging proposed by Defendants has been and will continue to prevent them from seeing, experiencing, otherwise enjoying marbled murrelets." Dkt. No. 2-1

**Page 22 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

at 21.    These concerns do not rise to the level of an injury-in-fact fairly traceable to the planned Benson Snake Unit timber harvest for at least two reasons.

First, as in this Court's decision in *Cascadia Wildlands v. BLM*, 2013 WL 5723315 (D. Or. 2013), Plaintiffs do not "allege the existence of any publicly accessible place from which they might observe" marbled murrelets on the Benson Ridge Tract.  *Id.* at *5.   Scott Timber Co. has posted the tract with no trespassing signs, as demonstrated by the Declaration of Francis Eatherington.  As a result, Plaintiffs do not have legal access to use and enjoy the Benson Ridge Tract and, therefore, cannot be injured by the displacement of marbled murrelets from hypothetically nesting in the 49-acre Benson Snake Unit.  Although Plaintiffs allege they can drive through the tract on a public access road, they have not alleged that they have ever attempted to observe murrelets from the road, nor that they have concrete plans to do so in the future.  Nor have Plaintiffs demonstrated that they would even have the legal right to stop along the road on Scott Timber Co.'s land to look for marbled murrelets.   Therefore, even assuming *arguendo* that Plaintiffs' allegations regarding marbled murrelet use of the Benson Snake Unit are true, their lack of legal access the tract to observe marbled murrelets precludes them from demonstrating an injury-in-fact arising from the timber harvest.

Second, to the extent Plaintiffs allege that harvesting the Benson Snake Unit will diminish their ability to see or experience marbled murrelets on the Elliott State Forest, those allegations are controverted by the record Plaintiffs have offered to the Court.  Plaintiffs cite and rely upon the opinion of a Wildlife Biologist for the Oregon Department of Forestry indicating that, based on his experience on the Elliott State Forest, "the chance of finding occupied sites within mature timber on the Elliott State Forest is about 50 percent."  Dkt. No. 2-1 at 14.  Plaintiffs have failed to provide any evidence to the Court that the harvest of the 49-acre Benson Snake Unit will

diminish their purported 50-percent chance of observing marbled murrelets in mature stands within the Elliott State Forest.  The only reasonable inference to draw from the record before the Court is that, following the harvest of the 49-acre Benson Snake Unit, Plaintiffs' chances of observing marbled murrelets in the Elliott State Forest will remain the same.[7]  Accordingly, Plaintiffs have failed to demonstrate an injury-in-fact fairly traceable to Scott Timber Co.'s planned harvest of the 49-acre Benson Snake Unit.

The Court should deny Plaintiffs' motion for preliminary injunction because they lack standing.

### C.  Plaintiffs Are Unlikely to Succeed on the Merits.

Section 9 of the ESA prohibits any "person" to "take" a wildlife species that is listed under the statute. 16 U.S.C. § 1538(a)(1)(B).  Section 9 further provides it is unlawful for any person "to attempt to commit, solicit another person to commit, or cause to be committed" any offense in ESA Section 9.  16 U.S.C. § 1538(g).  The ESA defines "take" to include "harm" and "harass." 16 U.S.C. § 1532(19).

By federal rule, harm is defined as:

> Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3 (emphasis added).

"Harass" is defined as:

_____

[7] Notably, although Plaintiffs allege generally that they use and enjoy the Elliott State Forest adjacent to the Benson Ridge Tract, they come forward with no evidence suggesting that they have used or enjoyed the adjacent drainage comprising the Benson Southeast survey site (located in part within the Elliott State Forest) to observe marbled murrelets or for any other purpose, despite the fact that WEST discovered and determined that it is an area used by marbled murrelets for nesting.

an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.

*Id.*

Under the harm regulation, it is possible for habitat modification, such as timber harvest, to "take" an ESA-listed species. However, "habitat modification or degradation, standing alone, is not a taking pursuant to Section 9. To be subject to Section 9, the modification...must result in actual injury to a protected wildlife species." 46 Fed. Reg. 54750 (Nov. 4, 1981) (preamble to "harm" regulation). "[H]abitat modification does not constitute harm unless it 'actually kills or injures wildlife.'" *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000). In other words, for habitat modification to constitute take, three elements must be present: (1) the habitat modification must be "significant"; (2) it must "significantly impair essential behavioral patterns"; and (3) through the indirect mechanism of impairing behavioral patterns, some concrete actual injury or death must "actually" occur to a member of a listed wildlife species. 50 C.F.R. § 17.3 (harm regulation); 46 Fed. Reg. 54748-50 (Nov. 4, 1981) (preamble to "harm" regulation).[8] A good example of these principles in practice is in *U.S. v. West Coast Resources LP*, 2000 WL 298707 (D. Or. 2000), where Judge Hogan determined that the harvest of a tract of old growth

---

[8] Notably, the U.S. Fish and Wildlife Service, in the 1975 preamble for the regulations defining "harm" and "harass" intended for the "harm" regulation to apply to habitat modification as opposed to the "harass" regulation. 40 Fed. Reg. 44412, 44413 ("The concept of environmental damage being considered a 'taking' has been retained, but is now found in a new definition of the word 'harm.' 'Harm' covers actions or omissions which actually (as opposed to potentially), cause injury. In addition, the definition of 'harass' has been modified by restricting its application to acts or omissions which are done intentionally or negligently. [...] By moving the concept of environmental degradation to the definition of 'harm,' potential restrictions on environmental modifications are expressly limited to those actions causing actual death or injury to a protected species of fish or wildlife. The actual consequences of such an action upon a listed species is paramount.") (emphasis added).

Page **25** – **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

used by spotted owls as foraging habitat would not take any owls because the owls would have ample suitable habitat remaining elsewhere in which to forage.

Here, Plaintiffs are unlikely to succeed on the merits because they have not provided sufficient evidence to demonstrate that harvesting the Benson Snake Unit will actually kill or injure a marbled murrelet by significantly impairing breeding behaviors.  Plaintiffs' theory appears to be that the single observation of a pair of birds flying at 0.8 canopy height in 2014 by Mr. McMahon demonstrates that the Benson Snake Unit is an important breeding area for marbled murrelets and that harvesting the unit will significantly impair breeding murrelets that would hypothetically return to the Benson Snake Unit to breed and hypothetically experience reduced nesting success as a result of the harvest.  Assuming *arguendo* the truth and validity of Mr. McMahon's purported *observation*,[9] Plaintiffs have not provided a single expert to substantiate their attenuated, *hypothetical theory of causation*.  For this reason alone, their motion should be denied.  *See CBD v. U.S. BOR*, 6:15-cv-02358, Opinion and Order at 8 (April 4, 2016) (D. Or.) ("plaintiffs allege potential adverse effects … without providing any substantive evidence to quantify the harm that would result.  Without such quantified information, the court cannot find that the potential harm warrants the mandatory relief requested by plaintiffs.") (citations omitted).

Moreover, Plaintiffs' theory is controverted by the results of the Benson South Survey Area study that WEST performed over the last two years.  The results of the study demonstrate that the Benson Snake Unit is not used by marbled murrelets for nesting.  Courtney Decl. at ¶¶ 21-22.  Therefore, Plaintiffs' theory of causation for hypothetical future take fails at its first step.  Contrary

---

[9] In contrast to the independence and impartiality of the study WEST performed, Mr. McMahon's group, Coast Range Forest Watch, has demonstrated bias, by advocating against timber harvest on the Elliott State Forest.  *See* Griffith Decl., Exhibit 116.

to Plaintiffs' bare assertion that murrelets are nesting in the unit, the record before the Court demonstrates that the Benson Snake Unit was not used for nesting in either 2015 or 2016 and that it is not a nesting habitat that is used by marbled murrelets.  Courtney Decl. at ¶¶ 21-22; Thompson Decl. at ¶ 16. Therefore, harvesting the unit will not reduce the nesting opportunities of marbled murrelets, or otherwise actually kill or injure murrelets by significantly impairing breeding activities, in adjacent sites used for nesting.  Courtney Decl. at ¶ 22.  In addition, Scott Timber Co. is conducting the harvest outside the nesting season with the specific intent of avoiding any direction interaction with marbled murrelets during their breeding season.  Folk Decl. at ¶ 9; Courtney Decl. at ¶ 22.  Scott Timber Co. has taken a careful, reasoned, science-based approach in designing the Benson Snake Unit to avoid take of marbled murrelets.  *Ibid.*  Finally, Dr. Courtney assessed the significance of Mr. McMahon's 2014 observation and concluded that "the best available science suggests that any murrelets in [Benson Central] area are transients, and that the stand is not used for nesting."  Courtney Decl. at ¶ 20.

Plaintiffs' attempt to compensate for the absence of expert testimony with their attorneys' interpretations of the 2003 PSG Protocol and the factual findings and conclusions from the 1995 decision in *Marbled Murrelet v. Pacific Lumber Co.*, 880 F.Supp. 1343 (N.D. Cal. 1995). Plaintiffs' attorneys assert that, under their reading of the PSG Protocol, Mr. McMahon's 2014 observation means all the contiguous mature timber is "occupied" by marbled murrelets.   In contrast to Dr. Courtney, Plaintiffs' attorneys are not qualified to determine and interpret the best available science as scientific experts.  For that reason alone, the Court should reject their argument and theory of take.  *See CBD v. U.S. BOR*, 6:15-cv-02358, Opinion and Order at 10 (finding that plaintiffs failed to meet their burden of proof due the genuine dispute among relevant experts; in

contrast, in this case, Plaintiffs have come forward with no experts) (citations omitted).[10] However, there are at least two additional problems with Plaintiffs' approach.

First, although the *study design* of the PSG Protocol provides a reasonable approach for designing and carrying out audio-visual surveys of marbled murrelets, the PSG Protocol's guidelines and recommendations for *interpreting survey data* is not based on the latest and best available science and, further, does not preclude a highly qualified expert such as Dr. Courtney from interpreting the significance of murrelet observations based on the totality of relevant evidence. Courtney Decl. at ¶¶ 10-16. Plaintiffs have filed numerous cases against federal agencies arguing that they are legally required to reinitiate ESA consultation on the basis of significant new scientific information and data, including a case challenging an HCP that formerly covered the Elliott State Forest. *See, e.g.*, *See Ctr. for Biological Diversity v. Henson*, No. CIV. 08-946-TC, 2009 WL 1882827 (D. Or. June 30, 2009); *see also Audubon Society of Portland v. National Marine Fisheries Service*, 849 F.Supp.2d 1017 (D. Or. 2011); *Natural Resources Defense Council v. Kempthorne*, 506 F.Supp.2d 322 (E.D. Cal. 2007) (Center for Biological Diversity was a plaintiff). Thus, surely Plaintiffs must agree that simply because the PSG Protocol may have been found to be based on the best available science by a court in 1995 does not mean that it still is today. As explained by Dr. Courtney, the PSG Protocol has not been revised for thirteen years and, during that time period, significant published research has emerged that directly controverts assumptions that underpin some of the PSG Protocol's guidelines and recommendations for

---

[10] Defendants reserve the right to seek leave from the Court to submit additional evidence, including testimony from additional experts, and/or briefing in the event Plaintiffs seek to submit new or additional evidence in support of their motion for a preliminary injunction. Defendants also reserve the right to request an evidentiary hearing. Defendants further make these reservations without prejudice to filing a motion to strike against any new evidence Plaintiffs may attempt to submit.

interpreting survey data.  Courtney Decl. at ¶¶ 12-16.  Applying the best available science, Dr. Courtney concludes that "it is unlikely that Benson Central is a nesting habitat that is used by marbled murrelets."  *Id.* at ¶ 22.

Second, there are material factual distinctions between this case and the *Pacific Lumber* case.  In *Pacific Lumber*, environmental groups sued a private timber company alleging that the timber company's plans to log 137 acres of a 440 acre contiguous stand of old growth forest (the "Owl Creek stand") would cause take of marbled murrelets.  The Owl Creek stand was part of one of only three marbled murrelet nesting habitats remaining in California at the time.  880 F.Supp. at 1348.  Further, Owl Creek was part of the "smallest remaining cluster [of murrelets] located in 'an isolated locality' in south central Humboldt County in the vicinity of Grizzly Creek State Park, Humboldt Redwoods State Park and Owl Creek."  *Id.* at 1348.  Although the court associated the Owl Creek stand with the forests located in nearby State parks, the court also noted that the Owl Creek stand was an isolated 440 acre stand of contiguous old growth forest that was "surrounded by previously harvested clear cut and second-growth forests for four to five miles in all directions." *Id.* at 1349.

In finding that the tract was used for marbled murrelet nesting, the court found that "the Owl Creek stand for nesting purposes" based on over 100 detections of marbled murrelets, including "numerous instances of 'occupied behavior.'"  *Id.*  Moreover, the court noted that these detections were documented despite the fact that the timber company "administered its marbled murrelet surveys … with the intent to either avoid detecting marbled murrelets or, to the extent that making detections could not be helped, to grossly understate the marbled murrelets' presence in [the harvest area]."  *Id.*  Further, the court found that the surveys were not conducted by independent people using the scientific method.  *Id.* at 1361.  The opposite is true here.

Page **29 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Here, Scott Timber Co. had no pre-determined objective to harvest any particular unit of timber from the Benson Ridge Tract; instead, prior to making a determination of where (and whether) to harvest, Scott Timber Co. hired WEST to investigate possible marbled murrelet use of the tract. Folk Decl. at ¶ 9. WEST designed and conducted an independent and unbiased study of the Benson South survey area, and provided habitat use delineations based on that study and the scientific method.  Courtney Decl. at ¶ 7, 17.  Further, during the two year study, no indications of nesting behaviors were observed in the Benson Central survey site where the Benson Snake Unit is located.  Thompson Decl. at ¶ 16; Courtney Decl. at ¶¶ 20-22.  Dr. Courtney has provided the Court expert testimony indicating that marbled murrelets are not using the Benson Central stand for nesting.  Courtney Decl. at ¶¶ 20-21.  Dr. Courtney's testimony is the only valid scientific expert testimony before the Court and it compels the conclusion that harvesting the Benson Snake Unit will not cause take of marbled murrelets by significantly impairing breeding activities.  As a result, Plaintiffs are unlikely to succeed on the merits and their motion for a preliminary injunction, accordingly, should be denied.

### D.  Plaintiffs Have Failed to Demonstrate Irreparable Harm.

Even if the Plaintiffs had demonstrated a likelihood of success on the merits, Plaintiffs have failed to demonstrate that they will suffer irreparable harm in the absence of a preliminary injunction because they have not demonstrated that it is likely that harvesting the 49-acre Benson Snake Unit will appreciably harm the marbled murrelet species as a whole, at the population level. Alternatively, they have failed to demonstrate that harvesting the 49-acre Benson Snake Unit constitutes a threat to the populations of marbled murrelets that use the Elliott State Forest and the surrounding Central Oregon Coast region.  In fact, the record before the Court points in the

opposite direction.  Contrary to Plaintiffs' assertions, marbled murrelet populations in Oregon have been stable over the last 10-plus years.

To warrant equitable relief, "plaintiffs must establish that irreparable harm is likely, not just possible." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "[C]onclusory allegations are insufficient." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1099 (9th Cir. 2007).  The Ninth Circuit has rejected the concept that "logging is per se enough to warrant an injunction because it constituted irreparable environmental harm."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010).  Further, it is not enough for a plaintiff to show irreparable harm to the environment.  Rather, a plaintiff must show that the injury to the environment is likely to cause irreparable harm to the plaintiff.  *See Winter*, 555 U.S. at 20 (explaining that a party seeking injunctive relief must show that "he is likely to suffer irreparable harm"). Plaintiffs are, as a matter of law, distinct from the marbled murrelet and must demonstrate irreparable harm to their interests. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004) (animals "do not have statutory standing to sue" under the Administrative Procedures Act or ESA).

Where a plaintiff's interest in a species relates primarily to the species as a whole (as opposed to specific animals), courts have consistently held that the likelihood of irreparable harm must be measured at the species level; i.e., a plaintiff must show "that the identified harm to the species is significant vis-a-vis the overall population, and not just that individual animals are likely to be injured." *Idaho Rivers United v. United States Army Corps of Engineers*, 156 F. Supp. 3d 1252, 1262 (W.D. Wash. 2015) (internal quotations omitted), *citing Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F.Supp.2d 1195, 1210 (E.D.Cal.2008); *Defenders of Wildlife v. Salazar*, 812 F.Supp.2d 1205, 1209–10 (D.Mont. 2009); *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F.Supp.2d 1290, 1315 (D.Or. 2011); *Wild Equity Institute v. City and Cnty. of San*

*Francisco*, No. C 11–00958 SI, 2011 WL 5975029, at *6–7 (N.D. Cal. Nov. 29, 2011); *see also*

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 796 (9th Cir. 2005).  In *Nw.*

*Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs,* Judge Acosta held:

> Irreparable harm to ESA listed species must be measured at the species level. *See NWF v. NMFS*, 422 F.3d 782, 796 (9th Cir. 2005) (holding that preliminary injunction is appropriate upon a showing of "irreparable harm to a threatened species"). This makes sense because the ESA explicitly permits the taking of individual members of a species in some circumstances.

817 F.Supp.2d at 1315.

Though Defendants believe that Judge Acosta's reasoning is the correct reasoning to apply in this case based on the purposes of the ESA, they also recognize that courts have in some narrow instances recognized standing in the absence of a showing of irreparable harm to the species as a whole *under statutes other than the ESA* and where the plaintiff demonstrates a specific and concrete interest in specific members of the species.  *See, e.g., Humane Soc. of U.S. v. Bryson*, No. 3:12–cv–00642–SI, 2012 WL 1952329, at *6 (D.Or. May 30, 2012).  However, in *Bryson* (which was decided under the Marine Mammal Protection Act), Judge Simon specifically cautioned that, because "the ESA aims to protect the viability of endangered or threatened species[, t]he loss of an individual animal that does not jeopardize the species as a whole may not offend the purpose of the ESA[.]"  *Id.* at *7.

Here, Plaintiffs have not demonstrated an interest in specific members of the marbled murrelet species.  At most, they have alleged a general interest in observing and experiencing marbled murrelets that nest in the Elliott State Forest.  However, they have not demonstrated that the harvesting of the Benson Snake Unit constitutes an irreparable threat of harm to the species as a whole, nor have Plaintiffs demonstrated a likelihood of such harm to marbled murrelets that use the Elliott State Forest and surrounding forests along the Central Oregon Coast.  Plaintiffs have

Page **32 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

not put forward a single expert to testify on the issue.  The expert testimony that is before the Court demonstrates that the most recent data on marbled murrelet populations indicate that members of the species along the Oregon Coast have been stable over the last 10-plus years, with the highest density of birds in Zone 3 found along the Central Oregon Coast, between Newport and Coos Bay. Courtney Decl. at ¶ 23.

Finally, this case is unlike *Pacific Lumber*.  Based on the specific circumstances of that case, the court concluded that "[b]ecause of the precarious state of the marbled murrelet population, the destruction of any significant amount of marbled murrelet habitat will result in a high probability that the Northern California population will become extinct." *Id.* at 1348.  There is no evidence before the Court that marbled murrelets using the Elliott State Forest and surrounding Central Oregon Coast Region face a similar threat based on Scott Timber Co.'s plan to harvest the Benson Snake Unit.  More than 11,000 acres have already been reserved for marbled murrelets on the Elliott State Forest as Marbled Murrelet Management Areas based on the documentation of nesting activity.  Griffith Decl., Exhibit 115.  Nearly 8,000 birds are located in Zone 3, where the Benson Ridge Tract is located. Courtney Decl. at ¶ 23. Plaintiffs submit in their motion that the chances of observing a marbled murrelet flying beneath the canopy in mature stands on the Elliott State Forest, which totals approximately 44,000 acres, is 50-percent. *Id.*; Dkt. No. 2-1 at 14.[11]

---

[11] This case is also unlike the injunction this Court issued against State of Oregon officials in *Cascadia Wildlands v. Kitzhaber*, 3:12-cv-00961-AA.  In that case, the State of Oregon chose to not address the merits of plaintiffs' motion and, instead, relied on the State's voluntary cessation of the timber harvest activities under challenge.  In addition, at the time of the injunction, none of the challenged timber sale projects were on the Benson Ridge Tract.

In short, the abundance of potentially suitable marbled murrelet habitat, coupled with the stable population status of the species, are completely different facts than those that were at issue in the *Pacific Lumber* case.  In *Pacific Lumber*, there was specific evidence demonstrating the challenged timber harvest was likely to cause a localized population of marbled murrelets to go extinct.  *See TVA v. Hill*, 437 U.S. 153 (1978) (same). Plaintiffs have offered no such evidence in this case.  Therefore, Plaintiffs have failed to demonstrate an imminent threat of irreparable harm.

### E.  The Balance of Harms and Public Interest Do Not Favor an Injunction.

The ESA requires federal agencies to use the "best available scientific and commercial data available" in making decisions and forming opinions about effects to ESA-listed species.  16 U.S.C. § 1536(a)(2).  It is not a requirement that applies to private parties such as Scott Timber Co.  Nevertheless, recognizing that the possibility of marbled murrelet use existed on the Benson Ridge Tract it purchased from the State of Oregon, Scott Timber Co. voluntarily committed itself to consulting with WEST in order to obtain and use the best available science in making timber management decisions.  Scott Timber Co. retained one of the pre-eminent wildlife experts in the United States, Dr. Courtney, whom the U.S. Fish and Wildlife Service frequently relies on to determine the best available science.

In short, Scott Timber Co. has invested significant time and money into advancing the study and understanding of the marbled murrelet.  Issuing an injunction under these circumstances would discourage private parties from investing in the study, protection and conservation of threatened and endangered wildlife species.  Such an injunction would not serve the public interest.

Further, given the robust populations of marbled murrelets along the Central Oregon Coast where the Benson Ridge Tract is located compared to the insignificant, speculative harm alleged by Plaintiffs, the balance of harms favors Defendants.  Scott Timber Co. needs to be able to

Page **34 – DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

commence harvest operations by mid-November in order to finish the operations before the start of the marbled murrelet nesting season in April 2017.  Folk Decl. at ¶ 9.  The insignificant harm alleged by Plaintiffs does not justify interference with Scott Timber Co.'s harvest plans.

## V.    THE BOND.

Defendants acknowledge that courts have recognized in some cases that the bond requirements of ORCP 65(c) can be waived or reduced to a nominal amount when requiring a bond sufficient to cover costs and damages when it "would effectively deny access to judicial review." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985).  However, here, Plaintiffs have failed to provide any evidence to the Court demonstrating that requiring a bond adequate to cover costs and damages to Defendants would constitute a hardship.  In the absence of such evidence, the Court should require a bond.

## VI.    CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted, this 23rd day of September, 2016

YOCKIM CAROLLO LLP

s/ Dominic M. Carollo
**Dominic M. Carollo,** OSB No. 093057
**Ronald S. Yockim**, OSB No. 814304
**Christopher T. Griffith,** OSB No. 154664
430 S.E. Main Street
P.O. Box 2456
Roseburg, Oregon 97470
Phone:   (541) 957-5900
Fax: (541) 957-5923

# CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2016, I served the foregoing document through the

Court's Electronic Case Filing system on:

Nicholas Cady
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
Telephone: (541) 434-1463
Email: nick@cascwild.org

Daniel R. Kruse
Attorney at Law
101 East Broadway, Suite 230
Eugene, OR 97401
Telephone: (541) 870-0605
Email: dkruse@cldc.org

Tanya M. Sanerib
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
tsanerib@biologicaldiversity.org

                                        YOCKIM CAROLLO LLP


                                        s/ Dominic M. Carollo
                                        Dominic M. Carollo, OSB No. 093057
                                        dcarollo@yockimlaw.com
                                        Yockim Carollo LLP
                                        P.O. Box 2456
                                        Roseburg, OR 97470
                                        Telephone: (541) 957-5900

                                        Of Attorneys for Defendants Scott Timber Co.
                                        and Roseburg Forest Products Co.

CERTIFICATE OF SERVICE