IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CASCADIA WILDLANDS, THE CENTER
FOR BIOLOGICAL DIVERSITY, and
AUDUBON SOCIETY OF PORTLAND,

        Plaintiffs,

    v.

SCOTT TIMBER CO., ROSEBURG
RESOURCES CO., and RLC INDUSTRIES
CO.,

        Defendants.

Case No. 6:16-cv-01710-AA
**OPINION AND ORDER**

---

AIKEN, Judge:

    In this Endangered Species Act ("ESA") citizen suit, plaintiff environmental

organizations seek to permanently enjoin defendant logging companies from logging a forty-

nine-acre section of the Elliott State Forest known as the Benson Snake Parcel. Plaintiffs allege

that the Benson Snake Parcel is occupied habitat of marbled murrelets, sea birds that are listed as

threatened species under the ESA. Plaintiffs further contend that logging the Benson Snake

Parcel will result in "take" of the marbled murrelet, in violation of Section 9 of the ESA, 16

U.S.C. § 1538(a)(1)(B). Defendants move for summary judgment on the ground that plaintiffs lack standing to sue. For the reasons set forth below, defendants' motion is denied.

## BACKGROUND

This case concerns the effect of logging on marbled murrelets, "small sea bird[s]" that "spend most of their time at sea feeding on fish, but nest and engage in courtship behaviors and breeding inland in contiguous mature and old-growth forests." First Am. Compl. ¶ 39. Since 1992, marbled murrelets in Washington, Oregon, and California have been listed as "threatened" under the ESA. *Id.* ¶ 49. Plaintiffs—Cascadia Wildlands, the Center for Biological Diversity, and Audubon Society of Portland—allege that "[t]he primary reason marbled murrelets are listed as a threatened species is the loss of older coastal forests that provide marbled murrelet nesting and breeding habitat." *Id.* ¶ 50. They further allege that "[t]he primary cause of forest loss and resulting marbled murrelet population declines is commercial timber harvest and related wind throw or blow down of trees, fire, and other natural events." *Id.*

On June 4, 2014, defendant Scott Timber Co. ("Scott Timber") purchased a 355-acre tract of land known as the Benson Ridge Parcel from the State of Oregon.[1] The Benson Ridge Parcel was previously part of the Elliott State Forest. On August 13, 2016, defendant Roseburg Resources Company notified the Oregon Department of Forestry of its plan to clear-cut the Benson Snake Parcel, a 49-acre tract of land located in the middle of the Benson Ridge Parcel.[2]

On August 25, 2016, plaintiffs filed this action, asserting that Benson Snake Harvest Operation would result in "take" of the marbled murrelet, in violation of Section 9 of the ESA.

---

[1] The history of that sale—and the ESA lawsuit that preceded it—is set out in detail in my prior opinion and order denying defendants' motion to dismiss for lack of pre-suit notice. *Cascadia Wildlands v. Scott Timber Co.*, 2018 WL 3341173, at *1–*3 (D. Or. July 5, 2018).

[2] In this opinion, I refer to defendants' proposed clear-cut as the Benson Snake Harvest Operation.

That same day, plaintiffs moved for a preliminary injunction to prevent defendants from moving forward with the Benson Snake Harvest Operation. In their opposition to that motion, defendants argued—among other things—that this Court lacked jurisdiction because plaintiffs did not have standing to sue.

Pursuant to stipulation of the parties, plaintiffs' standing at the summary judgment phase[3] will be determined by assessing whether two individual members of Cascadia Wildlands, Max Beeken and Rosemary Francis Eatherington, would have standing to bring this lawsuit.[4] Mr. Beeken is a professional wildlife biologist and the co-director of Coast Range Forest Watch, a Coos Bay-based nonprofit. Coast Range Forest Watch is a volunteer-run organization that performs citizen science surveys for the marbled murrelet in Oregon's coast range. In a declaration submitted in support of plaintiffs' motion for a preliminary injunction, Mr. Beeken stated

> I have personally been to the Benson Ridge [P]arcel, first in 2013 to enjoy the forests and wildlife there, and then again several times in 2014 to conduct murrelet surveys. Since the parcel was sold to a private timber company in 2014, I have been back to the Benson [R]idge [P]arcel, using the public road that goes through the parcel, and enjoying the forests there from the road and from adjacent public lands. I have plans to return to this area, both this year and next. My ability to use and enjoy the area for recreational aesthetic, person[al], professional, and scientific pursuits[] will be negatively impacted by the logging that is now proposed in occupied marbled murrelet habitat.

Beeken Decl. ¶ 24, Aug. 25, 2016.

---

[3] At the preliminary injunction stage, plaintiffs also relied on the sworn declaration of a third Cascadia Wildlands member. The parties have now agreed that standing will be assessed solely by reference to Mr. Beeken and Ms. Eatherington.

[4] An organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). The parties' dispute in this case hinges on the first prong of that three-part test.

Ms. Eatherington was the Conservation Director for Cascadia Wildlands from 2010 to 2015. In a declaration submitted in support of plaintiffs' motion for a preliminary injunction, Ms. Eatherington explained that she has visited the Elliott State Forest "on average twice a year" since 2002, often camping for two to three days at a time. Eatherington Decl. ¶ 5, Aug. 25, 2016. She stated

> I enjoy camping out and trying to hear or see marbled murrelets before the sun rises. I have taken several trips to the Elliott for the specific purpose of looking for murrelets at dawn. I camp under the stars and wake a little before dawn scanning the sky for murrelets. Generally, I always keep an eye out for murrelets when visiting the Elliott and have spent considerable time bird watching for other species of bird in the Elliott as well.

*Id.* ¶ 6. Regarding the Benson Ridge Parcel specifically, Ms. Eatherington reported that she visited that area "when it was still part of the Elliott State Forest" and

> continued to visit the area since the parcel with sold to Roseburg Forest Products. This area contains stunning old-growth with trees so large that Oregon no longer has a mill that can process them. I have viewed and enjoyed the forests in the parcel from the 4000 road that passes through the parcel, and from adjacent public lands. My most recent trip to Benson Ridge was on June 18, 2016. I stopped along the 4000 road and took several pictures of that visit, which are attached hereto as [E]xhibit 1. . . .
>
> I have definite plans to continue to use and enjoy the forests in and around the Benson Ridge parcel. Based on my many years of first-hand experience seeing the effects of logging, I am concerned that logging in the Benson parcel will have a negative effect on marbled murrelets in the area. Logging cuts up the forest and eliminates continuous forest stands in the surrounding Elliott State Forest, which are one of that forest's greater qualities. Without these continuous forest areas, I am concerned that my ability to hear or attempt to see murrelets in Benson Ridge parcel and the surrounding Elliott State Forest will be greatly reduced, which will diminish my enjoyment of the forest.

*Id.* ¶¶ 7–8.

I granted plaintiffs' motion and entered a preliminary injunction on December 19, 2016. In the opinion and order on the preliminary injunction, I addressed standing at length. I concluded that plaintiffs had demonstrated adequate "injury in fact," relying in particular on

statements regarding future plans to visit the Benson Ridge Parcel. *Cascadia Wildlands v. Scott Timber Co.*, 190 F. Supp. 3d 1024, 1031–32 (D. Or. 2016). I also found that plaintiffs had adequately alleged causation and redressability, as necessary to establish Article III standing to sue. *Id.* at 1032. On appeal, the Ninth Circuit reversed on other grounds but concluded that "Cascadia has standing to pursue this case. Cascadia's alleged injury—diminished ability to view the marbled murrelets—is cognizable as a recreational and aesthetic injury. And Cascadia's injuries are imminent, given members' concrete plans to visit the area to view marbled murrelets in the near future." *Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 623 (9th Cir. 2017) (unpublished) (citations omitted).

On remand, the parties agreed to forego further hearing on the preliminary injunction and instead expedite trial on the merits. Trial is set to begin on August 6, 2018.

On April 20, 2018, defendants took Mr. Beeken's deposition. In that deposition, Mr. Beeken testified that he drives on the "4000 road . . . several times a year to go into the Elliott for recreational purposes or to do surveys[.]" Kruse Decl. Ex 2 at 4, June 22, 2018. The "4000 road" is "a major road in and out of the Elliott" State Forest which runs through the Benson Ridge Parcel. *Id.*; Defs.' Mot. Summ. J. 17 n.4. Mr. Beeken stated that although he has been unable to leave the 4000 road to hike into the Benson Ridge Parcel since Scott Timber purchased the property, he has "walked down the road a few times since then" and enjoyed viewing the adjacent land. Kruse Decl. Ex. 2 at 4, June 22, 2018. The following exchange then took place:

> Defense Counsel: Since 2014 have you observed any marbeled murrelets on the Benson Ridge parcel?
>
> Mr. Beeken: No.
>
> Defense Counsel: Have you attempted to observe any marbled murrelets?
>
> Mr. Beeken: No.

Defense Counsel: Do you have any future plans to try to observe marbled murrelets on the Benson Ridge parcel?

Mr. Beeken: I have plans to go into this north section that's north of the parcel and do some scouting for potential survey stations in there and possibly do some surveying up there this summer.

Defense Counsel: Okay. Other than that plan, do you have any other future plans to try to observe marbled murrelets?

Mr. Beeken: Within the parcel?

Defense Counsel: Within the Benson Ridge tract.

Mr. Beeken: No, not specific plans.

Carollo Decl. Ex. 135 at 4, June 11, 2018. Later in his deposition, Mr. Beeken stated that he planned to go hiking "along the north and eastern edge of the Benson Ridge" Parcel, likely in "mid to late May." Kruse Decl. Ex. 2 at 12, June 22, 2018. In a declaration submitted in conjunction with plaintiffs' brief opposing summary judgment, Mr. Beeken reported that he in fact visited the Benson Ridge Parcel on May 29, 2018. He drove along the 4000 road, "enjoyed the mature forests there during [his] drive[,]" and scouted for areas to conduct murrelet surveys during summer 2018. Beeken Decl. ¶ 2, June 21, 2018.

At Mr. Beeken's deposition, defense counsel also asked "[d]o you think the harvest will affect your ability to observe or see murrelets on public forests?" Carollo Decl. Ex. 135 at 5, June 11, 2018. Mr. Beeken responded "[n]o." *Id.* Later in the deposition, following a break, defense counsel returned to that question:

Defense Counsel: And again, you don't think it would affect your ability to observe or see murrelets in that area based on the harvest. Correct?

Mr. Beeken: Well, it certainly could due to habitat fragmentation. And if that area is opened up, then there could be more predators in the area, corvids and jays—or corvids, including jays and crows and things like that, which could

reduce the likelihood of murrelets nesting in this drainage here. So I think it would make it less likely for me to observe murrelets in that area.

Defense Counsel: Well, earlier you said no, didn't you?

Mr. Beeken: I thought that was about that habitat.

Defense Counsel: No. I asked you about observing it.

Mr. Beeken: Oh, I apologize, then. I thought I was observing the habitat, in which there would still be murrelet habitat over here, but there'd be a less likelihood of finding murrelets there if the habitat's degraded by fragmentation.

*Id.* at 6.

Later on, plaintiff's counsel returned to the same issue:

Plaintiff's Counsel: Okay. There was a bit of confusion earlier, it seemed like, with questioning about your use of the area immediately to the east of the Benson Ridge parcel, where initially you kind of indicated that you don't know if it would affect your ability to see marbled murrelets, but then you clarified that you— maybe it would. Can you explain that a little bit more? And I'm talking specifically about the area directly east of the Benson Ridge parcel.

Mr. Beeken: Yeah. I thought that the question was referencing the habitat of marbled murrelets, if I would be able to observe the habitat of marbled murrelets in adjacent areas.

Plaintiff's Counsel: Okay.

Mr. Beeken: And we cleared that up.

Plaintiff's Counsel: Okay. And so do you believe that if this area—and I'm not asking you to offer a scientific opinion, but just based on your knowledge of marbled murrelets, do you believe that logging in the Benson Ridge area would negatively affect or reduce the likelihood of you observing marbled murrelets in the forests around there?

Mr. Beeken: Yes.

Kruse Decl. Ex. 2 at 12–13, June 22, 2018.

Defendants also took Ms. Eatherington's deposition on April 20, 2018. Ms. Eartherington testified that she had visited the Benson Ridge Parcel the previous month, in

March 2018, on a "spontaneous" trip with Mr. Beeken. Carollo Decl. Ex. 136 at 6, June 11, 2018. She also reported that she made trips to the Benson Ridge Parcel in October 2016 and in December 2016, and that she documented those trips with photographs. On all three trips, she drove along the "4000 road," which goes through the Benson Ridge Parcel. Kruse Decl. Ex. 1 at 12, June 22, 2018. Ms. Eartherington stated that although she did not have a specific return trip planned, she anticipated driving the 4000 road in the future, likely as early as May 2018. "When I get an opportunity, I'm in the area, I'm going somewhere, that's the main road I use." *Id.* at 12–13.

Ms. Eatherington reported that she had tried to look for marbled murrelets in the Elliott State Forest early in the morning about a dozen total times over the past fifteen years. But she testified she had never tried to observe marbled murrelets within a mile of the Benson Ridge Parcel.

Defense counsel questioned Ms. Eatherington at length about how a clear-cut of the Benson Ridge Parcel would affect her. Ms. Earthering stated:

> It would horrible. I mean clear-cuts are not very picturesque, and I love pretty forests. And I go to the Elliott and I go to other forests because I really love big trees and I love the greenery of the canopy and I love the birds that I see and I hear and the wildlife. And this is right on the main road. I mean it's going to be horrible to have to drive through a clear-cut when it used to be a beautiful forest . . . .

> I'm sure that that injury would plague me for a long time afterwards to see what was once a beautiful forest—to see it be clear-cut—not only clear-cut but all those aerial spraying of herbicides they do, killing every living thing in the forest except for what makes them money. I would just be hurt to the—to the depths of my soul. . . .

> There could be some unexpected injuries, driving through areas that have been recently aerial sprayed with herbicides. I don't know what kind of injury that would cause. Driving on a road that's been clear-cut next to, I don't know if there would be any landslides or hazardous driving conditions. I don't know if the road would be blocked by when I want to come and go out of that forest and

see the forest and have the road blocked by a logging operation, deterring me
from traveling into the forest.

Carollo Decl. Ex. 136 at 10–12. Ms. Eatherington further stated that she would be injured by

"[t]he loss of habitat, the loss of wildlife[,]" in particular because she enjoys observing and

photographing birds. *Id.* at 12. When defense counsel asked her to name the types of birds she

attempts to see and photograph, she listed wrens, robins, hawks, and owls, but did not mention

marbled murrelets.

Counsel then read back to Ms. Eatherington a portion of her August 2016 declaration in

which she expressed concern that logging would prevent her from exploring continuous mature

forest in the Oregon Coast range. When asked how the proposed harvest would contribute to

those concerns, Ms. Eartherington responded:

> It will reduce the continuous forest canopy and—big blocks of forest are
> really what's needed for wildlife like murrelets. When you have an edge effect, I
> understand it allows in more predators. And so I really enjoy being in a
> continuous forest because I like to think that I'm in the real world, the natural
> world as it was meant to be, and when you clear-cut part of it, then it just takes me
> out of that world.

*Id.* at 15.

## STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving

party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine

issue of material fact, the nonmoving party must go beyond the pleadings and identify facts

which show a genuine issue for trial. *Celotex*, 477 U.S. at 324. "Summary judgment is

inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could

return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

Defendants seek summary judgment on the issue of plaintiffs' standing to sue.[5] "A threshold question in every federal case is ... whether at least one plaintiff has standing." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (citation and quotation marks omitted). Standing must exist at the time the case is filed, *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989), and must continue to exist throughout the life of the lawsuit. *Defenders of Wildlife*, 504 U.S. at 561.

To establish Article III standing, the plaintiff must show (1) an injury in fact, which is an injury that is concrete and particularized, and actual or imminent; (2) a causal connection between the injury and the conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Id.* at 560–61. Each prong must be established "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. When the defendant

---

[5] Plaintiffs contend that the motion for summary judgment should be denied because the Ninth Circuit already ruled that they have standing to sue. That ruling is not the law of the case because defendants' motion rests on new evidence relevant to the factual determinations underlying the Ninth Circuit's conclusion about standing. *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (stating that the law of the case doctrine does not bar reconsideration of an issue when "the evidence on remand is substantially different[.]"). In addition, standing is a jurisdictional requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The law of the case doctrine, by contrast, is not jurisdictional; it is a discretionary doctrine rooted in concerns about judicial efficiency. *Alexander*, 106 F.3d at 876. When subsequent developments in a case call into question a prior determination about standing to sue, judicial efficiency concerns must yield to the court's "continuing independent obligation to determine whether subject-matter jurisdiction exists." *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 975 n.12 (9th Cir. 2012) (internal quotation marks omitted); *see also Public Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997) (declining to apply the law of the case doctrine to a prior determination about standing); *Cascadia Wildlands*, 2018 WL 3341173 at *6 ("[T]he law of the case doctrine never applies to questions of subject matter jurisdiction, which go to a court's authority to hear a case and cannot be waived.").

moves for summary judgment on the ground that the plaintiff lacks standing, the plaintiff "must set forth by affidavit or other evidence specific facts, which for the purposes of the summary judgment motion will be taken to be true." *Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (quoting *Defenders of Wildlife*, 504 U.S. at 561). "A plaintiff's basis for standing must affirmatively appear in the record." *Id.* (quoting *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1228 n.5 (9th Cir. 2008)).

In order to satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff's asserted injury must be concrete, particularized, and actual or imminent. *Defenders of Wildlife*, 504 U.S. at 560. "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society[.]" *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). As a result, it is well-established that injury to a plaintiff's ability to observe "birds and other wildlife" is constitutionally cognizable injury to "aesthetic, recreational, and scientific interests[.]" *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002). Similarly, when harm to the environment diminishes a plaintiff's recreational and aesthetic enjoyment of a particular area, that diminution qualifies as an injury in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

Plaintiffs assert that they have standing to sue based on two different interests: their interest in the marbled murrelet and their interest in the forest in which the marbled murrelet lives. Defendants argue that there is insufficient evidence in the summary judgment record to support the conclusion that either Mr. Beeken or Ms. Eatherington has standing to sue based on interest in the marbled murrelet. They further contend that, as a matter of law, standing to sue for an ESA Section 9 claim cannot rest on interest in the forest. I first address whether plaintiffs

have standing based on an interest in the forest and then assess whether they have standing based on an interest in marbled murrelets.

I.    *Plaintiffs have standing to sue to prevent injury to their aesthetic and recreational interests in the forest.*

Defendants first challenge plaintiffs' standing in connection with plaintiffs' asserted interest in the forest on the Benson Ridge Parcel. Defendants do not dispute that, as a factual matter, plaintiffs have a concrete, particularized interest in the forest. Defendants contend, however, that plaintiffs' interest in enjoyment of the forest itself is not legally cognizable in this case.

Defendants' argument proceeds as follows: plaintiffs have asserted a single claim, violation of Section 9 of the ESA. Section 9 prohibits "take" of protected species. *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 690 (1995). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* at 691 (quoting 16 U.S.C. § 1532(19)). "Harm," in turn, "means an act which actually kills or injures wildlife." 50 C.F.R. § 17.3. "[S]ignificant habitat modification or degradation" such as clear-cutting trees may qualify as "harm" under the ESA, but only if it "actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*; *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1238 (9th Cir. 2001) ("[M]ere habitat degradation is not always sufficient to equal harm."); 46 Fed. Reg. 54750 (Nov. 4, 1981) ("Habitat modification or degradation, standing alone, is not a taking pursuant to Section 9.").

It is apparent that the Benson Snake Harvest Operation would injure plaintiffs' aesthetic and recreational interests in the forest. The 4000 road runs directly past the Benson Snake Parcel. Mr. Beeken and Ms. Eatherington both testified that they regularly use that road and plan

to do so in the future, and that their enjoyment of the forest would be significantly diminished if a 49-acre parcel along that road were clear-cut. Defendants contend, however, that damage to plaintiffs' ability to enjoy the forest itself is not cognizable because it is not caused by the one thing that Section 9 prohibits: "take" of a protected species. Defendants' position is that it is not enough to show that the Benson Ridge Harvest Operation would cause injury to plaintiffs. They insist that the qualifying injuries in a Section 9 case must be caused *by the violation of Section 9 itself*.

The case law on Article III standing does not support defendants' narrow definition of cognizable constitutional injury. The general formulation of the standing test requires a "distinct and palpable injury to the plaintiff" and "a fairly traceable causal connection between the claimed injury and the *challenged conduct*." *Larson v. Valente*, 456 U.S. 228, 239 (1982) (emphasis added, alterations normalized, and citations and internal quotation marks omitted). The purpose of the standing requirement is to ensure that litigants have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 72 (1978). Here, Mr. Beeken and Ms. Eatherington have demonstrated that clear-cutting the Benson Snake Parcel will injure their aesthetic and recreational interests in the forests within the Benson Ridge Parcel. That injury is the type of personal stake in the controversy required by Article III.

In *Bennett v. Spear*, 520 U.S. 154, 158 (1997), the U.S. Fish and Wildlife Service issued a biological opinion concerning the impact of an irrigation project on two varieties of endangered fish. Pursuant to that opinion, the U.S. Bureau of Reclamation announced that it would change

its operation of a federal water reclamation scheme to protect the fish and maintain minimum water levels in two reservoirs. *Id.* at 159. The petitioners, "two Oregon irrigation districts and the operators of two ranches within those districts," sought judicial review under the citizen suit provision of the ESA. *Id.* They asserted that the proposed changes to the reclamation scheme would harm their "use of the reservoirs and related waterways for recreational, aesthetic, and commercial purposes, as well as for their primary sources of irrigation water[.]" *Id.* at 160 (internal quotation marks omitted).

The government argued that the petitioners lacked standing to sue by virtue of the "zone-of-interests test." *Id.* at 161. As a general rule, claimed violations of a statute are cognizable only when "a plaintiff's grievance . . . arguably fall[s] within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit." *Id.* at 162. The zone-of-interests test is not part of Article III's "irreducible constitutional minimum[,]" but is instead a "prudential requirement[,]" one of several "judicially self-imposed limits on the exercise of federal jurisdiction[.]" *Id.* (citing *Defenders of Wildlife*, 504 U.S. at 560–61 and *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Because the purpose of the ESA is to protect endangered species, the "zone of interests" for ESA cases might have been narrowly limited to protection of the interests of a listed species. *Id.* at 164. But in *Bennett*, the Supreme Court held that Congress chose to eliminate all prudential barriers to standing in ESA cases. *Id.* Thus, the zone-of-interests test did not apply, and the petitioners' asserted aesthetic, recreational, and commercial interests satisfied the requirements of Article III. *Id.* at 171.

Defendants are not relying on the zone of interests test. Their argument is that Article III requires a plaintiff's asserted injury to be caused by the narrow *violation of the law* rather than by the broad *conduct that violates the law*. *Bennett* is instructive on that point, as well. In

*Bennett*, it was not the narrow *protection of the endangered fish* that caused the petitioners' injuries. Instead, those injuries were caused by *the broader plan* the U.S. Bureau of Reclamation chose to implement in order to protect those species—a plan that, notably, focused on the management of the environment (*i.e.*, water) in which the species lived. The connection between the plaintiffs' interest in the forest and the marbled murrelet is strikingly similar to the connection between the *Bennett* petitioners' interest in irrigation water and the endangered fish that lived in the reservoirs. Just as the *Bennett* petitioners had standing based on their interest in the water in which the endangered fish lived, plaintiffs here have standing based on their interest in the forest in which the marbled murrelets live.

In support of their argument that any cognizable injury here must be caused by "take" of a listed species, defendants cite *Rivas v. Rail Delivery Service*, 423 F.3d 1079, 1082–83 (9th Cir. 2005), in which the court stated that "[a] plaintiff demonstrates injury in fact by pointing to some threatened or actual injury resulting from the putatively illegal action." In that case, the plaintiffs were owner-operators with the defendant motor carriers. *Rivas*, 423 F.3d at 1081. The plaintiffs alleged that their contracts with the defendants violated the California Insurance Code and various "Truth-in-Leasing" regulations promulgated by the Interstate Commerce Commission under the federal Interstate Commerce Commission Termination Act. *Id.* at 1082. The district court entered summary judgment for the defendants on the plaintiffs' federal damages claims and state-law claims, but permitted a single federal claim for injunctive relief to proceed to trial. *Id.* In connection with that claim, the plaintiffs asserted that the contracts failed to "state that the motor carrier assumes complete responsibility for the operation of the hauling equipment for the duration of the lease[,]" in violation of 49 C.F.R. § 376.12(c)(1). *Id.* The district court found for the plaintiffs and entered judgments prohibiting the defendants "from using equipment it did not

own to haul goods unless it entered into a written agreement that complied with § 376.12(c)(1)[.]" *Id.*

On appeal, the Ninth Circuit vacated the judgments and held that the district court lacked jurisdiction to entertain the claims for injunctive relief. *Id.* at 1083. The court noted that the plaintiffs "concede[d] that the regulatory violations for which they sought injunctive relief caused them no injury." *Id.* The injuries connected to the plaintiffs' claims for damages, which arose under separate regulatory provisions, could not confer standing on the district court to entertain the separate claim for injunctive relief. *Id.* Defendants argue that *Rivas* shows that a plaintiff's injury, for Article III purposes, must be caused by the violation of the law she seeks to challenge.

*Rivas* does not bear the weight that defendants seek to place on it. In *Rivas*, the plaintiffs challenged distinct provisions of their written agreements with the defendants, asserting that each challenged provision violated a particular provision of state or federal law. The court held that the plaintiffs' Article III standing to assert a violation of *one provision of law* could not rest on an injury caused by an act that allegedly violated a *different provision of law*. Here, plaintiffs challenge a *single action*: the clear-cut of the Benson Snake Parcel. They plausibly allege that the Benson Snake Harvest Operation will both cause "take," in violation of Section 9 of the ESA, and injure to their interests in the forest on the Benson Snake Parcel. Consistent with *Rivas*, they have connected their Article III injury to the defendants' allegedly illegal conduct.

Plaintiffs' recreational and aesthetic interests in the forest give them the requisite personal stake in the outcome of this case under Article III. In connection with those interests, plaintiffs have also shown causation and redressability: a clear-cut of the Benson Snake parcel would plainly cause the injury, and this Court has authority to enjoin the Benson Snake Harvest

Operation. Plaintiffs therefore have standing to sue based on imminent injury to their cognizable interests in the forest in and around the Benson Snake Parcel.

II.   *Plaintiffs have standing to sue to prevent injury to their aesthetic and scientific interests in marbled murrelets.*

Defendants also assert that plaintiffs cannot derive standing to sue from their interest in marbled murrelets. With respect to murrelets, defendants' argument is factual: they contend that although interest in the murrelets is a legally tenable basis for standing for an ESA Section 9 claim, the factual record in this case does not support the conclusion that plaintiffs have standing on that basis.

Specifically, defendants assert that Ms. Eatherington cannot show injury in fact because adverse impact to her ability to observe marbled murrelets is not among her primary concerns about the Benson Snake Harvest Operation. Relatedly, defendants contend that plaintiffs have not produced adequate evidence of causation and redressability with respect to Ms. Eatherington's interest in murrelets.

Separately, defendants contend that conflicts between Mr. Beeken's deposition testimony and the sworn declaration he submitted to this Court in August 2016 demonstrate that there was no imminent injury to Mr. Beeken's aesthetic and scientific interests in marbled murrelets at the time this lawsuit was filed. Defendants also argue that Mr. Beeken cannot make the required showing of injury in fact because he testified at his deposition that he does not believe that the Benson Snake Harvest Operation will affect his ability to observe marbled murrelets.

A.   *Evidence in the summary judgment record supports the conclusion that Ms. Eatherington faces imminent risk of injury to her aesthetic interest in marbled murrelets.*

Defendants aver that there is insufficient evidence that Ms. Eatherington will suffer injury in fact in connection with marbled murrelets. "The injury in fact requirement in

environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (internal quotation marks omitted). In *Ecological Rights Foundation*, the Ninth Circuit surveyed Supreme Court case law on aesthetic injury in environmental cases. *Id.* at 1148–50. The court rejected the idea that Article III's injury requirement could be assessed in a "one-size-fits-all, mechanistic manner[,]" concluding instead that the "necessarily personal and subjective" nature of aesthetic injury requires a "flexible approach." *Id.* at 1149–50. Courts may consider, among other factors, "residential contiguity and frequency of use." *Id.* at 1149. At bottom, the inquiry is whether the plaintiff has shown "a connection to the [species and] area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Id.*

Supreme Court and Ninth Circuit precedent illustrates how this flexible approach applies in different cases. For example, in *Defenders of Wildlife*, the analysis focused on the affidavits of two members of the plaintiff organization. 504 U.S. at 563. One of the members had made a single visit to Egypt in 1986 and observed the traditional habitat of the endangered Nile crocodile, while the other had made a single trip to Sri Lanka in 1981 and observed the habitat of the endangered Asian elephant and the leopard. *Id.* Both members averred that they intended to return to those areas at some unspecified point in the future. *Id.* The Court held that such "some day intentions" were insufficient to show risk of imminent injury in the absence of "any description of concrete plans" or specification or when the plaintiffs would visit the affected area in the future. *Defenders of Wildlife*, 504 U.S. at 564 (internal quotation marks omitted). In

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000), the Court tied the *Defenders of Wildlife* holding to the fact that the species in question lived "halfway around the world[.]" It made sense to require evidence of *specific* plans to return because it was not reasonable to presume, in the absence of such evidence, that the members of the plaintiff organization would in fact travel back to far-away places they had visited only once.

In *Friends of the Earth*, by contrast, members of the plaintiff environmental organization lived near an allegedly polluted river. 528 U.S. at 182. The members stated that they had previously used the river and the area around it for fishing, camping, swimming, picnicking, and hiking, but that they had stopped using due to concerns about "harmful effects from discharged pollutants" from the defendant's hazardous waste facility. *Id.* The Court held that because the plaintiff's members made such extensive use of the area in the past, they did not need to provide evidence of specific future plans to recreate in and near the river in order to show injury in fact. *Id.* at 184.

In *Ecological Rights Foundation*, the Ninth Circuit further expounded on the principles established in *Defenders of Wildlife* and *Laidlaw*:

> Daily geographical proximity, for instance, may make actual past recreational use less important in substantiating an injury in fact, because a person who lives quite nearby is likely to notice and care about the physical beauty of an area he passes often. On the other hand, a person who uses an area for recreational purposes does not have to show that he or she lives particularly nearby to establish an injury-in-fact due to possible or feared environmental degradation. Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person. An individual who visits Yosemite National Park once a year to hike or rock climb and regards that visit as the highlight of his year is not precluded from litigating to protect the environmental quality of Yosemite Valley simply because he cannot visit more often.

230 F.3d at 1149 (citations and internal quotation marks omitted). In sum, a plaintiff may show concrete, imminent injury in the absence of specific plans to visit an affected area (or observe an affected species) in the future so long as the record contains other evidence—for example, evidence of geographical proximity coupled with past use—that gives rise to a reasonable inference of future injury.

With that background in mind, I turn to the summary judgment evidence regarding plaintiffs' interest in marbled murrelets. Defendants first assert that Ms. Eatherington has not identified an actual, concrete injury because her interest in observing marbled murrelets is fleeting and abstract. At her deposition, Ms. Eatherington reported that she had tried to look for marbled murrelets in the Elliott State Forest about a dozen total times over the past fifteen years. When camping, she will "try to get up early and just open my eyes and look up, listen, look." Carollo Decl. Ex. 136 at 4, June 11, 2018. When examined at length about how she believed clear-cutting the Benson Snake Parcel would affect her, Ms. Eatherington primarily discussed the old-growth forest and other animal species; she mentioned marbled murrelets only briefly at the end of her testimony. Although Ms. Eatherington took multiple trips along the 4000 road and to the Benson Ridge Parcel between the date this lawsuit was filed and her deposition, there is no evidence in the summary judgment record that she attempted to observe marbled murrelets on any of those trips; indeed, she testified that she never has attempted to observe murrelets within a mile of the Benson Ridge Parcel.

It is clear from the record that Ms. Eatherington's past attempts to observe marbled murrelets were somewhat casual—they were an incidental part of her camping and hiking trips, the primary purpose of which was the enjoyment of the forest and observation and photography of other species of wildlife. But the casual nature of Ms. Eatherington's interest in marbled

murrelets is not fatal to her assertion of injury in fact. An injury may be "minimal" yet satisfy the requirements of Article III. *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008). Even "an identifiable trifle" may be sufficient to establish standing. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). So long as Ms. Eatherington has a concrete aesthetic interest in observing marbled murrelets, it does not matter that it is not her primary reason for enjoying the Benson Ridge Parcel. Here, the summary judgment record contains evidence that she attempted to observe murrelets about once per year over a fifteen-year period. That is sufficiently concrete and actual for Article III purposes.

Defendants next assert that the record contains insufficient evidence of future plans to observe marbled murrelets. Ms. Eatherington stated in her August 2016 declaration that she had "definite plans to continue to use and enjoy the forests" in and around the Benson Ridge Parcel. Eatherington Decl. ¶ 7, Aug. 25, 2016. She expressed concern that her "ability to hear or attempt to see murrelets in Benson Ridge [P]arcel and the surrounding Elliott State Forest will be greatly reduced, which will diminish my enjoyment of the forest." *Id.* ¶ 8. Between August 2016 and April 2018, however, Ms. Eatherington took at least three trips through the Benson Ridge Parcel, and on none of those occasions did she report attempting to observe marbled murrelets. At her deposition, Ms. Eatherington once again generally connected her concerns about the Benson Snake Harvest Operation to marbled murrelets—but she did not identify any concrete future plans to return to that area for the purposes of observing murrelets.

It is true that Ms. Eatherington has not provided evidence of date-specific future plans to attempt to view marbled murrelets in the Elliott State Forest. But she has consistently stated that she plans to attempt to view marbled murrelets in the future. She lives close enough to the

Elliott State Forest that she makes multiple trips there per year, often on the spur of the moment. And over the past decade and a half, she has attempted to see or hear marbled murrelets roughly once per year. Under the framework summarized in *Ecological Rights Foundation*, the summary judgment record contains sufficient evidence to support a finding of imminent injury to Ms. Eatherington's aesthetic interest in marbled murrelets.

B. *Plaintiffs have introduced sufficient evidence of causation and redressability with respect to Ms. Eatherington's interest in murrelets to survive summary judgment.*

Defendants next argue that Ms. Eatherington lacks standing to sue on the basis of her interest in marbled murrelets because plaintiffs have not produced sufficient evidence of causation and redressability. They contend that because Ms. Eatherington has never attempted to observe marbled murrelets within a mile of Benson Ridge Parcel, the Benson Snake Harvest Operation will not injure her ability to observe marbled murrelets in the Elliott State Forest in the future. Relatedly, they assert that enjoining the Benson Snake Harvest Operation would not redress any injury to Ms. Eatherington connected to marbled murrelets.

For Article III purposes, causation "requires a showing that [the plaintiff's] injury is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (internal quotation marks omitted). "Redressability does not require certainty, but only a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Nw. Requirements Utilities v. F.E.R.C.*, 798 F.3d 796, 806 (9th Cir. 2015). Although causation focuses on the link between a defendant's action and a plaintiff's injury and redressability focuses on a court's power to alleviate that injury, "causation and redressability are two sides of the same coin." *Ctr. for Biological Diversity v. Export-Import Bank of the U.S.*, — F.3d —, 2018 WL 3149770, at *5 n.2 (9th Cir. June 28, 2018) (internal quotation marks omitted).

Defendants insist that causation and redressability in this case require proof that Ms. Eatherington attempted (or plans to attempt) to observe marbled murrelets in the Benson Ridge Parcel rather than in the broader Elliott State Forest. That argument ignores plaintiffs' contention that habitat fragmentation can harm marbled murrelets across a wide geographic area—that is, that clear-cutting one area of a contiguous stand of forest can reduce murrelet occupancy across a much larger swath of forest both because murrelets may be killed directly by the harvest operation and because clear-cutting increases the likelihood that murrelets will be killed by predators. Whether plaintiffs can prove that contention by a preponderance of the evidence is at the very heart of this trial. Accordingly, granting summary judgment on that ground would conflate the standing inquiry with the merits, something the Ninth Circuit has expressly stated that federal courts must be careful to avoid in environmental cases. *Ecological Rights Found.*, 230 F.3d at 1151. Plaintiffs have produced sufficient evidence of causation and redressability in connection with Ms. Eatherington's interest in marbled murrelets to proceed beyond summary judgment.

      C.    *Mr. Beeken adequately alleged imminent injury to his scientific and aesthetic interests in marbled murrelets when this lawsuit was filed.*

Defendants acknowledge this Court's determination, affirmed by the Ninth Circuit, that Mr. Beeken had adequately alleged concrete plans to return to the Benson Ridge Parcel to observe marbled murrelets. They urge reconsideration of that determination in light of what has happened in the two years since this lawsuit was filed, noting that a plaintiff must have standing at the time a case is filed in federal court. *Defenders of Wildlife*, 504 U.S. at 571 n.4.

Mr. Beeken submitted a declaration in support of plaintiffs' motion for a preliminary injunction in August 2016. In that declaration, he stated:

> I have plans to return to [the Benson Ridge Parcel] area, both this year and next. My ability to use and enjoy the area for recreational aesthetic, person[al], professional, and scientific pursuits[] will be negatively impacted by the logging that is now proposed in occupied marbled murrelet habitat.

Beeken Decl. ¶ 24, Aug. 25, 2016. At his deposition, Mr. Beeken testified that he drives along the 4000 road several times per year and that he has gotten out and hiked along the 4000 road a few times since Scott Timber purchased the property in June 2014. He also testified that he had not attempted to observe marbled murrelets in the Benson Ridge Parcel since 2014.

Defendants argue that Mr. Beeken's statement that he had plans to return to the Benson Ridge Parcel to observe murrelets is not credible in hindsight, because we now know that he did not actually attempt to observe murrelets on any trip to that area between 2014 and his deposition in 2018.

As explained in Section II.B, *supra*, the requirements to demonstrate imminent injury to aesthetic or recreational interests vary from case to use. Mr. Beeken's past activity and his status as co-director of Coast Range Forest Watch demonstrate a strong scientific and aesthetic interest in observing and surveying marbled murrelets in the Elliott State Forest and near the Benson Ridge Parcel specifically. Because the evidentiary record contains such strong evidence of an ongoing interest in marbled murrelets, Mr. Beeken can show concrete injury even in the absence of date-specific plans to survey or observe marbled murrelets in the future.

Viewed in hindsight, one possible explanation for Mr. Beeken's failure to attempt to observe murrelets on the Benson Ridge Parcel between the 2014 surveys and his 2018 deposition notwithstanding his 2016 is that he was attempting to "manufacture facts in support of standing" and he that never had any actual plans to return to observe marbled murrelets in that area. Defs.' Mot. Summ. J. 15 n.2. But that is not the only possible interpretation of the record. At his deposition, Mr. Beeken reported that he had plans to scout for new survey sites in May 2018 and

begin new surveys for marbled murrelets later in the summer. In a supplemental declaration, Mr. Beeken confirmed that he completed that scouting trip on May 29, 2018. Although Mr. Beeken did not make trips to the Benson Ridge Parcel to observe marbled murrelets in 2017 (arguably "this year" at the time of his 2016 declaration), he is in the process of making such trips in 2018 (arguably the "next" year at the time of that declaration). Because the evidence of his past observation of and surveys regarding murrelets is strong, the summary judgment record supports the inference that his 2016 assertion of future plans to observe marbled murrelets was credible and a sufficient allegation of concrete injury at the outset of this lawsuit, even if he did not completely follow through on his plans as described in his declaration.[6] Accordingly, the arguable conflict between Mr. Beeken's 2016 declaration and his activities (or lack thereof) in 2016 and 2017 is not a sufficient ground for summary judgment.

D.   *Conflicts in Mr. Beeken's deposition testimony do not entitle defendants to summary judgment.*

Finally, defendants assert that Mr. Beeken cannot show injury in fact because he testified that he believes that the Benson Snake Harvest Operation will not harm his ability to observe marbled murrelets. As explained in the Background section of this opinion, at Mr. Beeken's deposition, defense counsel asked "do you think the harvest will affect your ability to observe or see murrelets on public forests?" Carollo Decl. Ex. 135 at 5, June 11, 2018. Mr. Beeken responded "[n]o." *Id.* Following a break, Mr. Beeken amended his answer. He explained that he had misunderstood defense counsel's question: "I thought I was observing the habitat, in

_____

    [6] Defendants' argument on this point is focused on whether Mr. Beeken had alleged injury in fact at the preliminary injunction phase. Because plaintiffs must have standing at all stages of litigation, I note that Mr. Beeken's deposition testimony regarding his plans to scout for survey locations and begin marbled murrelet surveys in summer 2018 provide sufficient evidence of continuing injury in fact to survive summary judgment.

which there would still be murrelet habitat over here, but there'd be a less likelihood of finding murrelets there if the habitat's degraded by fragmentation." *Id.* at 6.

Defendants contend that there is "no believeable basis upon which Mr. Beeken could plausibly have been confused by the question" at his deposition. Defs.' Reply Supp. Mot. Summ. J 12. They note that Mr. Beeken's "admission that he did not believe his ability to observe marbled murrelets on public forests would be affected by the harvest was a stunning moment" in his deposition. *Id.* Defendants accuse Mr. Beeken of attempting to change his testimony in order to "manufacture facts in support of standing." Defs.' Mot. Summ. J. 15 n.2. They ask this Court to strike Mr. Beeken's testimony explaining his confusion and amending his answer under the sham affidavit rule.

"In order to accept an alteration or correction of deposition testimony, the court must be persuaded that the changes had a legitimate basis, *i.e.*, the testimony required clarification, the deponent genuinely misunderstood the question, or the deponent gained access to new evidence containing material facts." *Macy v. Waterford Operations, LLC*, 2017 WL 5668003, at *1 (D. Or. Nov. 27, 2017). Here, a reading of Mr. Beeken's testimony in the context of the full summary judgment record amply supports the conclusion that he misunderstood the question. Mr. Beeken has consistently stated through affidavits and in his deposition that he believes his ability to observe and survey marbled murrelets will be harmed by the Benson Snake Harvest Operation. By responding "no" to defense counsel's question on that topic, he made a stunning about-face on an issue central to the claims at issue in this lawsuit. Defense counsel did not confront him with any evidence that might explain such a sudden departure from his previous (and subsequent) testimony. One plausible explanation for the incongruity is the one provided by Mr. Beeken—he simply misunderstood the question. Defense counsel may find that

explanation implausible, but I disagree. Particularly in a high-pressure setting such as a deposition, it is easy and common to misunderstand a question. Because I am not convinced that the contradiction between Mr. Beeken's statements is a sham, the sham affidavit rule does not apply. *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). Defendants are free to re-raise this issue at trial if they believe it bears on Mr. Beeken's credibility, but it is an improper ground for summary judgment. *See id.* (stating that "the sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment") (internal quotation marks omitted).

Even if I were inclined to strike Mr. Beeken's testimony under the sham affidavit rule, he would retain standing to sue based on his interest in murrelets. Mr. Beeken is not an expert in this case. As a result, his lay opinion about whether the Benson Snake Harvest Operation will affect his ability to observe marbled murrelets in the Benson Ridge Parcel has limited evidentiary value. Mr. Beeken's testimony is critical to establishing that he has a qualifying injury in fact, but carries far less weight with respect to causation and redressability; as to marbled murrelets, those issues will be settled through expert testimony introduced at trial.

## CONCLUSION

The summary judgment record contains adequate evidence of standing to sue based on Mr. Beeken's and Ms. Eatherington's interest in marbled murrelets and in the forest itself. Defendants' Motion to for Summary Judgment (doc. 66) is DENIED.

IT IS SO ORDERED.

Dated this 27th day of July 2018.

_____
Ann Aiken
United States District Judge