DANIEL R. KRUSE (OSB 064023)                                    Hon. Ann L. Aiken
Daniel R. Kruse, Attorney at Law
101 East Broadway, Suite 130
Eugene, OR 97401
Phone: (541) 687-6788
Fax: (541) 345-3373
Email: dan@speakthelaw.com

*Attorney for Plaintiffs*
*Additional counsel for Plaintiffs listed below*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS, THE CENTER FOR BIOLOGICAL DIVERSITY**, and **AUDUBON SOCIETY OF PORTLAND**,<br><br>　　　　　　　　　　　Plaintiffs,<br>v.<br><br>**SCOTT TIMBER CO., ROSEBURG RESOURCES CO.,** and **RLC INDUSTRIES CO.,**<br><br>　　　　　　　　　　　Defendants. | Case No.: 6:16-CV-01710-AA<br><br>**PLAINTIFFS' COMBINED MOTIONS *IN LIMINE*** |

Plaintiffs Cascadia Wildlands, The Center for Biological Diversity, and Audubon Society of Portland (collectively, "Plaintiffs") respectfully submit the following combined Motions in Limine.

I.  **THE COURT SHOULD EXCLUDE TESTIMONY, OPINIONS, AND EXHIBITS CONCERNING THE PURPORTED "SUPPLEMENTAL" EXPERT DISCLOSURE FROM JOEL THOMPSON.**

First, Plaintiffs request that the Court exclude all opinions, testimony, and exhibits arising from the "Supplemental" expert disclosure of Defendants' hybrid fact/expert witness, Mr. Joel Thompson.  Mr. Thompson is a testifying expert witness that timely submitted an initial expert report under Fed. R. Civ. P. 26(a)(2)(B).  Mr. Thompson's initial expert report outlines how Defendants' consultant, WEST, Inc., prepared and implemented a marbled murrelet survey effort at the Benson Ridge tract in accordance with the Pacific Seabird Group's "Methods for Surveying Marbled Murrelets in Forests: A Revised Protocol for Land Management and Research."  Plaintiffs' expert Dr. Richard Golightly prepared an expert rebuttal report to Mr. Thompson's initial expert report.  Dr. Golightly's rebuttal report discusses several ways in which WEST's survey effort did not ensure effective coverage of the entire survey area.  Mr. Thompson did not prepare or submit an expert rebuttal report on the May 30, 2018 deadline that the parties stipulated to.

Mr. Thompson was originally deposed in this case as a fact witness on May 2, 2018.  During that deposition, Mr. Thompson testified that, "To my knowledge, upon hindsight, there was a small, roughly, acre to 2-acre area that potentially wasn't fully covered by a standard 200-meter survey plot."  Fourth Declaration of Daniel R. Kruse, Ex. 8 ("Thompson Tr.") at 38:17-39:5).  Mr. Thompson's expert report does not discuss or mention this one- to two-acre area that WEST's surveys missed.

On July 11, 2018 – the day after Plaintiffs agreed to cancel Mr. Thompson's expert deposition – Defendants' counsel provided Plaintiffs with an unsigned document entitled "Notes of Joel Thompson related to rebuttal report of Dr. Richard Golightly."  Fourth Decl. of Daniel

**PLAINTIFFS' COMBINED MOTIONS *IN LIMINE* - Page 2 of 10**

Kruse. Defense counsel indicated that this document "may be considered a supplement to Joel's expert report[.]" *Id*. In this document, Mr. Thompson attempts to rebut points raised by Plaintiffs' expert Dr. Golightly in his rebuttal report. Mr. Thompson apparently personally visited the site on July 6, 2018; investigated the criticisms Dr. Golightly made in his rebuttal; prepared notes explaining why Dr. Golightly was, in Mr. Thompson's expert opinion, incorrect; and referenced new photographs and exhibits that had heretofore not been produced to Plaintiffs in the course of discovery. None of these matters are addressed in Mr. Thompson's original expert report.

If Mr. Thompson's July 11, 2018 "Notes" are considered a rebuttal expert report to the criticisms raised by Dr. Golightly, then it should be disallowed by operation of Fed. R. Civ. P. 37(c)(1) because it comes over a month after the Parties agreed to exchange rebuttals. See Fed. R. Civ. P. 26(a)(2)(D)(ii) ("Absent a stipulation or a court order, [expert] disclosures must be made: …(ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure). Under Rule 37(c)(1), "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *See also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to [disclosure] requirements by forbidding the use at trial of any information required to be disclosed [under the Federal Rules] that is not properly disclosed").

Here, the failure to provide this "rebuttal" is not substantially justified, as Mr. Thompson was aware of the shortcomings of WEST's survey efforts in his May 2, 2018 fact deposition but

**PLAINTIFFS' COMBINED MOTIONS *IN LIMINE* - Page 3 of 10**

opted not to address them at all in his initial expert disclosure. Defendants were also made directly aware of Dr. Golightly's opinions, which were timely provided to Defendants in writing, but Defendants failed to respond within 30 days as required. The failure is not harmless because Plaintiffs cancelled their expert deposition of Mr. Thompson just the day before Mr. Thompson's "rebuttal" was first disclosed and, more urgently, Plaintiffs are preparing for a bench trial under the highly condensed and ambitious schedule that Defendants' themselves proposed.

If, on the other hand, Mr. Thompson's July 11, 2018 "Notes" are considered "supplementation" of his original report under Fed. R. Civ. P. 26(a)(2)(E), then such supplementation is also improper. "Supplementation" under Fed. R. Civ. P. 26(e) "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998). Supplementation is not intended to permit parties to add new opinions to an expert report based on evidence that was available at the time the initial report was due. As one court described:

> [S]upplementary disclosures do not permit a party to introduce new opinions after the disclosure deadline under the guise of a "supplement." Although Rule 26(e) obliges a party to "supplement or correct" its disclosures upon information later acquired, this does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report (indeed, the lawsuit from the outset). To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports[.] Enabling this pattern of behavior would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines. Accordingly, a supplemental expert report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original expert report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c).

*Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010) (internal citations and quotations omitted).

**PLAINTIFFS' COMBINED MOTIONS *IN LIMINE* - Page 4 of 10**

Here, Mr. Thompson knew nearly thirty days before his initial expert report was due that there were areas WEST's murrelet surveys did not cover, as Mr. Thompson testified to in his deposition. Mr. Thompson was also very familiar with the PSG Protocol, which outlines the requirements for ensuring effective coverage of the survey area. As such, this information was available at the time of his initial expert disclosure, making any supplementation improper and unjustified. The failure is not harmless, as this case proceeds to trial in one week, and Plaintiffs have no time in which to conduct additional investigation or depositions to understand Mr. Thompson's new opinions. Consequently, by operation of Rule 37(c)(1), the Court should exclude any opinions, testimony, or exhibits based on Mr. Thompson's July 6 site visit and July 11 "Notes."

## II. THE COURT SHOULD EXCLUDE ANY EVIDENCE OR TESTIMONY CONCERNING THE DEFENDANTS' PROPOSED LONG-TERM MITIGATION MEASURES

At trial, Plaintiffs will offer evidence that logging in the Benson Ridge parcel will harm and harass marbled murrelets by, among other things, fragmenting the landscape and thereby increasing the likelihood of predation on murrelets and their nests. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996) ("harm" under the ESA includes significant habitat modification that increases the likelihood of predation). Defendants' own expert, Dr. John Marzluff, has stated, "[i]f unmitigated, harvesting timber from the planning area in the southwest portion of the Benson Ridge Tract is likely to increase the abundance of nest predators and the risk of predation on murrelet nests throughout the Benson Ridge Tract." Dkt. no. 26-3 (Declaration of Dr. Marzluff) at 10.

Defendants seek to counter this "take" by arguing that the increased risk of predation of murrelet nests is caused by an increased abundance of predators, especially jays, and that the

**PLAINTIFFS' COMBINED MOTIONS *IN LIMINE* - Page 5 of 10**

increased abundance of jays following a clearcut is caused by the propagation of new food sources such as berry-producing shrubs in the newly cleared area.  Defendants will likely argue that they can effectively mitigate the increased risk of predation for 10-15 years following the clearcut by regularly using herbicides to prevent berry-producing shrubs from growing in the newly cut area and, to a lesser extent, by cleaning up garbage (there are several illegal dump sites in the area, which also attracts Jays and other predators), and by using fake emetic eggs to adversely condition predators in the area.

What Defendants lack, however, is any testifying expert to discuss (a) the types, chemical composition, and amounts of herbicides that may be applied by Defendants; (b) whether and to what extent those herbicides are effective at killing and preventing the specific types of berry-producing plants that may grow over the course of fifteen years if the site is clearcut; (c) whether those herbicides may have any other deleterious impacts on marbled murrelets and thereby cause "take" during Defendants supposed "mitigation;" and (d) the degree and homogeneity of herbicide coverage over the site that aerial applications will achieve.  Defendants did not provide any expert report that addresses the effectiveness of various herbicide treatments at reducing or eliminating berries and shrubs from a new clearcut, and without this expertise, Dr. Marzluffs' testimony about the effects of eliminating berries and shrubs on local jay populations is entirely speculative.  While Dr. Marzluff may have insight on the impact to jays from removing berries and shrubs from the site, Defendants do not have any qualified expert to testify about whether their proposed herbicide treatments will actually work.  These matters require expert testimony, which Defendants opted not to provide.

More significantly, however, Defendants cannot rely, as a matter of law, on voluntary long-term mitigation measures to avoid liability under Section 9 of the ESA, because they have

**PLAINTIFFS' COMBINED MOTIONS *IN LIMINE* - Page 6 of 10**

not obtained the requisite Habitat Conservation Plan and Incidental Take Permit from the U.S. Fish and Wildlife Service ("USFWS").  16 U.S.C. § 1539(a)(1)(B), (a)(2).  The ESA provides a specific legal framework for avoiding liability under Section 9 by developing and implementing a formal mitigation plan, which must be reviewed and approved by USFWS, and which is then enforceable.  *Id.*

Under Section 10, a Habitat Conservation Plan must specify, among other things, the "steps the applicant will take to minimize and mitigate" impact to listed species and "funding that will be available to implement such steps," and the Plan may include any other measures the USFWS deems "necessary or appropriate for purposes of the plan."  16 U.S.C. § 1539(a)(2)(A).  A Habitat Conservation Plan and Incidental Take Permit will only be approved when USFWS determines, among other things, that (1) the applicant "will, to the maximum extent practicable, minimize and mitigate the impacts of such taking," (2) the applicant "will ensure that adequate funding for the plan will be provided," and (3) that the measures required by USFWS will actually be met, and (4) that USFWS has "received such other assurances as [it] may require that the plan will be implemented."  *Id*. at § 1539(a)(2)(B).  Further, "[t]he permit shall contain such terms and conditions as the [USFWS] deems necessary or appropriate to carry out the purposes of this paragraph, including, but not limited to, such reporting requirements as the [USFWS] deems necessary for determining whether such terms and conditions are being complied with."  *Id.*  Importantly, unless the terms of the Incidental Take Permit and Habitat Conservation Plan are strictly complied with (including the requirement for adequate funding of the Conservation Plan), and the Secretary "shall revoke" any permit in which the permittee is non-compliant.  *Id*. at § 1539(a)(2)(C).

**PLAINTIFFS' COMBINED MOTIONS *IN LIMINE* - Page 7 of 10**

Thus, the ESA provides a distinct legal mechanism whereby Defendants could obtain a permit authorizing the take of murrelets – a take that Defendants' own expert recognizes will occur absent significant and long-term herbicide applications and other mitigation efforts to reduce murrelet predation.  Defendants have opted not to avail themselves of this Congressionally-mandated process, instead hoping the Court will somehow "approve" Defendants' proposed, hypothetical course of mitigation as a substitute for the mechanism Congress specifically created for this purpose.  The Court should decline the invitation, as evidence of "mitigation efforts" to avoid a murrelet take must take the form of an application for an Incidental Take Permit and accompanying Habitat Conservation Plan.

A central part of the Habitat Conservation Planning process is that the proposed mitigation measures are reviewed for their effectiveness and approved by USFWS.  Here, despite the fact that predator-driven fragmentation effects have been a significant problem that has been known and studied by USFWS and other murrelet researchers for decades, it does not appear that anyone other than Dr. Marzluff has ever proposed herbicide treatments to mitigate the effects of fragmentation on marbled murrelets, and it does not appear that USFWS has ever recognized or is even aware of the possibility of using herbicides for this purpose.  Fourth Declaration of Daniel R. Kruse, Ex. 3 ("Marzluff Tr.") at 112:9-23 (Dr. Marzluff could not recall whether he shared his 1999 report, which is the only written report that mentions using herbicides to reduce murrelet predation, with any regulatory agencies, but does know that he has never received any type of formal response from a regulatory agency about this work); *Id.* at 107:9-108:2 (Dr. Marzluff does not know why his hypothesis concerning herbicide applications has not been mentioned in any publications concerning the effects of fragmentation on murrelets).

**PLAINTIFFS' COMBINED MOTIONS *IN LIMINE* - Page 8 of 10**

If Defendants are permitted to clearcut in the Benson Ridge parcel, the loss of habitat and increased fragmentation will be certain.  Without a Habitat Conservation Plan, the effectiveness and enforceability of Defendants' proposed long-term mitigation plan is not.  Indeed, that Defendants' proposed "mitigation" is hypothetical, non-public, and unenforceable makes it even more important that the Court exclude this evidence and testimony, as efforts to mitigate a take of a threatened or endangered species must take the form of an accountable Habitat Conservation Plan, not expert conjecture and unenforceable promises.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' Combined Motions *in Limine*.

RESPECTFULLY FILED AND SERVED THIS 27TH DAY OF JULY, 2018.

/s/ Daniel R. Kruse
DANIEL R. KRUSE (OSB 064023)
dan@speakthelaw.com
101 East Broadway, Suite 130
Eugene, OR 97401
(541) 687-6788
(541) 345-3373 (fax)

NICHOLAS S. CADY (OSB 113463)
nick@cascwild.org
Cascadia Wildlands
PO Box 10455
Eugene, Oregon 97455
(541) 434-1463
(541) 434-6494 (fax)

BRIAN P. SEGEE (*pro hac vice*)
bsegee@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 1646
OjaI, CA 93024

              (802) 750-8852

              DANIEL C. SNYDER (OSB 105127)
              dan@tebbuttlaw.com
              Law Offices of Charles M. Tebbutt, PC
              941 Lawrence St.
              Eugene, OR 97401
              (541) 344-3505
              (541) 344-3516 (fax)

              *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

  I hereby certify that on July 27th, 2018, I served the forgoing through the CM/ECF system and by email on:

Dominic M. Carollo
Yockim Carollo LLP
dcarollo@yockimlaw.com

              /s/ Daniel R. Kruse
              DANIEL R. KRUSE (OSB No. 064023)
              dan@speakthelaw.com
              101 East Broadway, Suite 130
              Eugene, OR 97401
              (541) 687-6788
              (541) 345.3373 (Fax)

              *Attorney for Plaintiffs*