DANIEL R. KRUSE (OSB 064023)
Daniel R. Kruse, Attorney at Law
101 East Broadway, Suite 130
Eugene, OR 97401
Phone: (541) 687-6788
Fax: (541) 345-3373
Email: dan@speakthelaw.com

*Attorney for Plaintiffs*
*Additional counsel for Plaintiffs listed below*

Hon. Ann L. Aiken

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS, THE CENTER FOR BIOLOGICAL DIVERSITY,** and **AUDUBON SOCIETY OF PORTLAND,** | Case No.: 6:16-CV-01710-AA |
| Plaintiffs, | **PRETRIAL ORDER** |
| v. | |
| **SCOTT TIMBER CO., ROSEBURG RESOURCES CO.,** and **RLC INDUSTRIES CO.,** | |
| Defendants. | |

Pursuant to Fed. R. Civ. P. 16 and LR 16-5, Plaintiffs Cascadia Wildlands, The Center

for Biological Diversity, and Audubon Society of Portland (collectively, "Plaintiffs"), and

Defendants Scott Timber Co., Rosburg Resources Co. and RLC Industries Co. (collectively,

"Defendants"), respectfully submit the following Proposed Pretrial Order.

I.    **NATURE OF THE ACTION.**

This case is brought by Plaintiffs pursuant to the citizen-suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g). Plaintiffs allege that Defendants' will unlawfully "take" marbled murrelets, a threatened species, by implementing the Benson Snake logging operation, in violation of 16 U.S.C. §§ 1538(a)(1)(B) and 1533(d) and 50 C.F.R. §§ 17.21(c)(1) and 17.31. Plaintiffs seek to permanently enjoin the Benson Snake logging operation, as well as an award of their reasonable attorneys' fees, expert witnesses' fees, and costs. This case will be heard before Judge Aiken in a bench trial beginning August 6, 2018.

II.    **FEDERAL JURISDICTION**

Subject to Defendants' objections, noted below, the Court has jurisdiction over this matter pursuant to 16 U.S.C. §§ 1540(c), (g), as well as federal question jurisdiction under 28 U.S.C. § 1331 as this action arises under federal law. The Court affirmed that Plaintiffs' pre-suit notice pursuant to 16 U.S.C. § 1540(g)(2)(A)(i) was legally sufficient. Dkt. No. 79 (Order Denying Motion to Dismiss).[1] Defendants contend that Plaintiffs lack Article III standing and that the Court therefore lacks jurisdiction, as outlined in Defendants' pending Motion for Summary Judgment, Dkt. No. 66.

III.    **STIPULATED FACTS**

The Parties jointly stipulate to the following agreed facts:

**The Parties**

1.    Plaintiffs are non-profit environmental organizations whose purposes and missions include protecting threatened and endangered wildlife, including marbled murrelets, and their habitat. The protection of marbled murrelets and their forested habitat are

---

[1] Defendants preserve their right to appeal this ruling.

germane to Plaintiffs' organizational purposes.  Max Beeken and Rosemary Francis Eatherington are members of Plaintiff Cascadia Wildlands.

2.    Defendants are Domestic Business Corporations in the State of Oregon.  Defendants' corporate entities have the same address, primary place of business, president, secretary, and registered agent.

**Marbled Murrelets**

3.    The marbled murrelet (*Brachyramphus marmoratus*) is a seabird of the *alcid* family.

4.    Murrelets spend most of their lives at sea but fly inland to nest in mature and old-growth forests.  Murrelets do not build nests, but instead lay their eggs on thick, flat tree branches with natural depressions and a blanket of moss.  Generally, only very large trees contain such platforms, and murrelets are thus closely associated with old-growth and other mature forests that contain suitable platforms for nesting.

5.    Although it has not been documented or found to occur in Washington, Oregon or California, murrelets have been documented nesting on the ground in Alaska, especially near or along cliffs.

6.    The U.S. Fish and Wildlife Service listed the marbled murrelet as a threatened species under the ESA in California, Oregon, and Washington in 1992. At the time of listing, the U.S. Fish and Wildlife Service stated that the "marbled murrelet is threatened by the loss and modification of nesting habitat (older forests) primarily due to commercial timber harvesting" and because of "mortality associated with current gill-net fishing operation off the Washington Coast and the effects of oil spills."  57 Fed. Reg. 45,328 (Oct 1, 1992).  According to the listing decision published by the U.S. Fish and Wildlife Service in 1992, "[t]he principal factor affecting the marbled

murrelet in the three-state area, and the main cause of population decline has been the loss of older forests and associated nest sites." 57 Fed. Reg. at 45,330.

7.    In 1996, the U.S. Fish and Wildlife Service designated 3,887,800 acres of federal and non-federal land as critical habitat for marbled murrelets under 16 U.S.C. § 1533(a)(3), consisting of: 1,247,180 acres in Washington; 1,514,200 acres in Oregon; 693,200 acres in Northern California; and 48,000 acres in Central California.  61 Fed. Reg. 26,269.  In 2016, the U.S. Fish and Wildlife Service revised the critical habitat designation to 3,698,100 acres.  81 Fed. Reg. 51,348.

8.    In a 2009 status review, the U.S. Fish and Wildlife Service estimated that there was 2.2 to 3.95 million acres of suitable nesting habitat remaining in the contiguous United States and 3.7 to 4.94 million acres of suitable nesting habitat in British Columbia.

9.    As part of the implementation of the Northwest Forest Plan, the U.S. Fish and Wildlife Service and U.S. Forest Service have been monitoring at-sea population levels of marbled murrelets since 2000.  The most recent report was released May, 2018.  Trial Exhibit 191.  According to the 2018 report, the 2016 population size estimates were: 7,095 birds in Washington; 10,060 birds in Oregon; and 6,073 birds in California.  From 2000-2016, the at-sea population of murrelets in Oregon increased at an average annual rate of change of 1.8%.

10.    Over the approximately same time period that the at-sea murrelet population in Oregon has increased, the U.S. Fish and Wildlife Service and U.S. Forest Service estimated in a 2018 report that 59,200 acres of higher suitability murrelet habitat was removed due to timber harvest on non-federal lands in Oregon from 1993 to 2012, as

well as 19,400 acres from federal lands in Oregon. Trial Exhibits 180 and 184.  The report's authors also noted that although "murrelet nesting habitat seems to be the primary driver of murrelet population status and trend, at least in recent decades, [] that relationship has not been tested empirically and a cause-effect relationship has not been established."  Trial Exhibit 187.

11.    Marbled murrelets do not nest every year.  Marine conditions and offshore food availability and distribution influence murrelet nesting distribution and patterns.  In Oregon, the murrelet nesting season is considered to run April 1 to September 15.

12.    During the nesting season, marbled murrelet feathers are cryptically colored in browns and whites to blend into the forest environment making them difficult to spot while inland.

13.    The female lays one egg and the male and female incubate the egg in shifts while the other bird feeds in the ocean. The egg is usually incubated for 30 days and fledging takes 28 days. Typically, the male and female switch incubation shifts at dawn or dusk to avoid detection by predators.

**The PSG Protocol**

14.    Marbled murrelets are notoriously difficult to detect due to their high velocity flight, small size, cryptic plumage, and crepuscular behavior.   The first murrelet nest was not located until 1974.

15.    The Pacific Seabird Group (PSG) is a society of seabird researchers, managers and other seabird enthusiasts that is "dedicated to the study and conservation of seabirds and their environment[,]" which includes marbled murrelets.  The PSG has developed a protocol "designed to provide researchers and land managers with standardized

techniques to detect murrelets in forests." Trial Exhibit 11 at 6.  This protocol is
titled "*Methods for Surveying Marbled Murrelets in Forests: a Revised Protocol for
Land Management and Research,*" and is referred to as the "PSG Protocol" or "Evans
Mack et al. 2003." Trial Exhibit 11.

16.    The PSG Protocol was not designed specifically to find murrelet nests, but rather its
stated objectives are as follows: "The objectives of this protocol are to provide
scientifically-based methods for biologists, managers, and researchers to: (1)
document the occurrence or probable absence of murrelets in a forest at the time of
surveys; (2) interpret the biological significance of behaviors observed during surveys
to evaluate how murrelets are using forests (i.e., classify sites as 'presence',
'occupied', or 'probable absence'); (3) identify the geographic distribution of the
Marbled Murrelet; and (4) provide consistency in surveys among land managers. This
protocol is based on analyses of 10 years of survey data to provide a statistically-
reliable approach to classifying surveyed areas." Trial Exhibit 11 at 7.

17.    The PSG survey protocol begins with a definition of the "Survey Area." According to
the protocol, the Survey Area includes all suitable murrelet nesting habitat in the
proposed project area as well as any suitable murrelet nesting habitat that is
contiguous to the proposed project area and within a quarter mile of the project area
boundary. If the Survey Area is less than 61 ha (150 acres), the survey area is
represented as a single site. For survey areas larger than 61 ha, "Survey Sites" of at
most 61 ha (150 acres) are defined within the survey area.

18.    The recommended number of stations within each Survey Site varies to provide
adequate coverage by observers across the site. The Protocol states that "[a] general

rule of thumb is that your stations should be located **throughout** the site." Trial

Exhibit 11 at 15 (bolding in original).  The "[P]rotocol recommends that 200 meters be

set as the maximum detection distance for audio-visual surveys, and thus defines station

effective area as a 200-m radius circle centered on the survey station [(30 acres)]." *Id.* at

14.  However, a higher density of stations may be required based on the area,

topography, and vegetation of the site. Stations are distributed throughout each

Survey Site and are located so that the view to the sky is unobstructed (e.g. forest

clearings, adjacent to streams). The Protocol also recommends that field visits

identifying the most suitable murrelet nesting habitat be factored into station

placement.

19.      An example of a Survey Area layout with three Survey Sites and multiple survey

stations is provided in Figure 3 of the Protocol, shown below. *Id.* at 37.



20.      Each year, stations are visited in the breeding season between May 1 and August 5 to

obtain the 5 to 9 replicate visits within each Survey Site to assess occupancy status. If

a site contains only a single station, then this station must be visited 5 to 9 times to assess site occupancy. If a site contains between 2 and 5 stations, then stations will need to be revisited over time to obtain the minimum number of visits to determine occupancy status at the site. If a site contains more than 9 stations, then each station need only be visited once. However, two stations visited on the same day only represent a single visit to the site. If no presence detections are made within the first 5 visits, then the survey ceases for the year. Visits should be spaced to occur every 6 to 30 days to ensure that survey occasions occur during the most active periods.

21.    The unit of measure for surveys under the PSG protocol is the visual or audio "detection" of a single bird or multiple birds.  A detection is the "sighting or hearing of one or more birds acting in a similar manner and initially occurring at the same time." *Id.* at 8.  The PSG protocol study design relies upon observed murrelet behaviors to "lead to classifications of sites and, ultimately, survey areas" as follows (*Id.* at 27):

*Probable Absence*. A site of potential habitat where no murrelets were detected after the requisite number of surveys.

*Presence*. A site of potential habitat where murrelets were detected, but subcanopy behaviors were not observed. <u>Additional survey effort</u> is required at areas with birds present to determine whether or not a site is occupied. **Presence sites** include those with:

    • non-stationary audio detections;

    • birds flying in small- or large-radius circles above the canopy;

    • above-canopy dives (that do not end below the canopy) or other above-canopy

flight.

*Occupied Site.* An **occupied site** is a site where at least one of the following subcanopy behaviors or conditions occurs:

- discovery of an active nest, a recent nest as evidenced by a fecal ring or eggshell fragments (see Appendix B) on structures in the forest canopy, or an old nest cup and landing pad;
- discovery of a downy chick, an egg, or eggshell fragments on the forest floor;
- birds flying below, through, into, or out of the forest canopy within or adjacent to a site of potential habitat. This includes birds flying over or along roads, young stands, or recently-harvested areas adjacent to potential habitat. However, only the adjacent site of potential habitat, not the non-habitat, should be classified as occupied. If birds are observed along a road where there is more than one site that the birds could be using, additional surveys may be required in some cases to determine which is occupied, if these sites are not part of the same survey area. Some subcanopy flights, such as low-flying birds observed in steep canyons or crossing ridge lines in non-habitat areas, are not associated with the site of interest and should not be considered occupied behaviors. Questions about flight behavior and occupancy should be directed to your regulatory agency for resolution.
- birds perching, landing, or attempting to land on branches;
- birds calling from a stationary location within the site. A detection should be considered 'stationary' when three or more calls are heard at less than 100 m (328 feet) from the observer, and the position of the bird does not appear to change. Detection of stationary calling is rare in most regions.

22.    The 9 station visits within each Survey Site for two years the Protocol sought to "follow the frequently-used convention of establishing a target of 95% confidence of survey outcome," supported by a statistical analysis set forth in Appendix A of the Protocol, authored by Diane Evans Mack and Danille Prenzlow Escene. *Id.* at 18. Jim Baldwin and Tim Max designed and conducted the statistical tests summarized in Appendix A, with assistance from, inter alia, Bryan Manly and Chris Nations of WEST, Inc. The Protocol explains that "if no more than a 5% misclassification error for occupied sites is desired, then we recommend a two-stage sampling approach (see below) that incorporates a minimum of 5, and an expectation of 9, survey visits in each of 2 years to estimate occupancy status at an individual site." *Id.*

23.    The statistical analysis found at Appendix A of the PSG Protocol providing the foundation for the 95% confidence level was performed for, and applies to, the Survey Site level, not the Survey Area level.

24.    If a single visual detection of subcanopy flight is observed at any one survey station, then the entire Survey Area, including all Survey Sites within the Survey Area, is classified as an "occupied site" according to the PSG Protocol.

25.    The Protocol includes a decision tree, Figure 8, demonstrating the classification process for Survey Sites, as shown below (*Id.* at 41):



26.     The Protocol states that "[o]ccupied sites include nest sites, but an occupied site also

can be used for purposes other than nesting that are essential for the complete life

history of the bird.  For example, courtship displays in other alcids can take place

near, but not at, the breeding site. Murrelets have been observed landing in unsuitable

trees in unsuitable habitat contiguous with or near suitable habitat in Oregon and

British Columbia (S. K. Nelson, pers. comm.). These landings generally involve more

than one murrelet and the birds remain standing in these young trees for a period of

time. Thus, the places where birds engage in courtship or other breeding-related

activities might not be in the exact same area or stand as a nest, but these areas are

just as important as nesting sites for the birds' life history."   *Id.* at 27-28.

27.    The PSG Protocol states, "Because the survey area, by definition, is continuous

potential habitat, the highest classification of probable absence, presence, or

occupancy among the sites within the survey area applies to the survey area. When

one survey site encompasses the entire survey area, the outcome of surveys at that site

applies to the survey area interchangeably. In contrast, when a survey area is divided

into more than one site, the outcomes at the sites, collectively, determine the status of

the survey area. For example, if a block of continuous potential habitat is divided into

three contiguous survey sites, and one of those three sites yields subcanopy

detections, the entire survey area is considered occupied, not just that one site,

because all the sites form one large piece of continuous habitat (see 'importance of

continuous habitat', p. 6)." *Id.* at 28.

28.    This "importance of continuous habitat" discussion states that "[t]he hypothesis that

continuous habitat is important is based on the following observations on the nesting

behavior of murrelets and alcids in general:

> (1) Although Marbled Murrelets nest solitarily, more than one pair of birds are
>
> usually found in a single, continuous forest (Nelson and Peck 1995). The
>
> interaction of murrelets in a single stand seems important for social and breeding
>
> purposes.
>
> (2) As two or more pairs of murrelets might nest asynchronously in a stand (or
>
> perhaps even renest), murrelets could be nesting at different times - and therefore
>
> different places - in the same stand in the same year.
>
> (3) Over several years, murrelets might use more than one nest tree or use
>
> different parts of a stand for nesting (Nelson 1997). Murrelets exhibit high nest

site fidelity, with some stands supporting 20+ years of murrelet use (Divoky and Horton 1995). A few nest trees have been used in consecutive years (Singer et al. 1995, Nelson 1997, Manley 1999); however, most are not, suggesting that breeding birds may move elsewhere within a stand in successive years or may not nest every year." *Id.* at 11.

29.     The PSG Protocol states: "The detection of occupied behaviors in forests implies that the area serves as a breeding location for murrelets.  We have no data from which we can recommend how long after surveys are completed that the results of those surveys remain valid. Murrelet surveys reflect the breeding status of sites for the time period during which surveys were conducted. As a breeding area, murrelets may nest there every year, in alternate years, or once in several years (Manley 1999). The extent of use, re-use, or abandonment of nest areas, or establishment of new areas, is unknown." *Id.* at 28. The Protocol recommends that "occupied stands should be treated as occupied indefinitely." *Id.* at 29.

30.     The PSG Protocol has not been revised since 2003.

## Benson Ridge Property

31.     The Benson Ridge property is located in portions of Sections 12 and 13, Township 23 South, Range 12 West, W.M., Coos County, Oregon. It consists of Tax Lot 600 in Section 12 and 100 in Section 13. The Benson Ridge Tract is approximately 355 acres total and is located roughly five to six miles east and slightly north of the city of Lakeside in Coos County, Oregon.  Trial Exhibit 105 is an aerial image of the Benson Ridge tract which shows the property boundaries (red lines), the approximate age classes of the forests (by color and number), and the boundaries of the proposed

logging unit (in black cross hatching).



32.    The Benson Ridge Tract is not designated as critical habitat for the marbled murrelet
       by the U.S. Fish and Wildlife Service. *2

33.    The entire Benson Ridge Tract was once part of the Elliott State Forest, owned and
       managed by the State of Oregon, but was sold to Defendants by the Oregon
       Department of State Lands ("DSL") in 2014. The sale followed a preliminary
       injunction issued by this Court against DSL, prohibiting logging in any occupied

---

2 Plaintiffs dispute the relevance of this fact in cases brought under Section 9 of the ESA.

marbled murrelet habitat in the Benson Ridge Tract and the entire Elliott State Forest. *See Cascadia Wildlands v. Kitzhaber, 3:12-cv-00961-AA* (D. Or. Nov. 19, 2012) (Dkt. No. 71).

34.     The Elliott State Forest is approximately 94,000 acres.  About half of the Elliott State Forest is 80 years of age or older and potentially suitable for marbled murrelet nesting.  Trial Exhibit 115.  Most of the older forests on the Elliott regenerated naturally the following Coos Bay Fire of 1868 and are approximately 90-150 years old, though some remnant scattered older trees (more than 150 years old) exist that survived the fire.

35.     Prior to the sale of the Benson Ridge Tract, a professional forester, Jerry Witler, prepared an appraisal of the Benson Ridge Tract for DSL.  Trial Exhibit 20.  Based a discussion with a State biologist for the Elliott State Forest, and review of habitat characteristics utilized by the Washington Department of Natural Resources, Mr. Witler stated his opinion that "The Marbled Murrelet has a high probability of occupying about 219 acres and an additional 71 acres will also be affected because of the buffer area around the potential occupancy area." Mr. Witler reported that the State wildlife biologist for the Elliott State Forest, Nick Palazzotto, told him that, "based on his experience, the chance of finding occupied sites within mature timber on the Elliott State Forest is about 50 percent." * [3]

36.     Defendants completed their purchase and acquired title to the entire Benson Ridge Tract from the State of Oregon on June 4, 2014.

---

[3] Defendants dispute the relevance and probative value of the appraisal but do not dispute the characterization of the contents of the report or that it is a public record.

37.    Plaintiffs served their initial pre-suit notice letter on Defendants on June 3, 2014.

**Marble Murrelet Surveys at Benson Ridge**

38.    Subsequent to Plaintiffs' notice letter, Defendants engaged Western EcoSystems
Technology, Inc. ("WEST") to evaluate whether, and to what extent, marbled
murrelets utilize the Benson Ridge Tract for nesting.

39.    Between 2015 and 2016, WEST conducted two years of marbled murrelet surveys in
the Benson Ridge Tract and in suitable habitat within one-quarter mile outside of the
Tracts (on lands owned by the State of Oregon consisting of the Elliott State Forest).
WEST's surveys were conducted under the PSG Protocol.

40.    WEST's surveyors all received their training and certification in marbled murrelet
surveying under the PSG Protocol from Sean McAllister, Mad River Biologists.

41.    The portions of the Benson Ridge Tract surveyed by WEST predominantly consist of
trees ranging from approximately 127-138 years old, some of which have mossy
branch platforms that marbled murrelets could attempt to use for nesting. Roughly
one-third of the Tract consists of 37-42 year-old timber and was not surveyed by
WEST after determining it was not suitable for murrelet nesting. This unsuitable
habitat is generally located in the central portion of the Benson Ridge Tract and
separates the suitable habitat in the northern portion of the parcel from the suitable
habitat in the southern portion of the parcel (see Exhibit 105, above).

42.    WEST designated the block of contiguous habitat in the southern portion of the tract
as the "Benson South Survey Area," which is 268.7 acres and, according to WEST,
"was defined for our efforts as contiguous blocks of mature and potentially suitable
murrelet habitat[.]"

43.     WEST divided the Benson South Survey Area into three Survey Sites under the PSG

Protocol.  Those three sites are named "Benson West" (25.3 acres); "Benson Central"

(111.8 acres); and "Benson Southeast" (131.6 acres total, including 24.6 on the

Benson Ridge tract and the rest on land owned by the State of Oregon).  Trial Exhibit

102 illustrates the entire Benson South Survey Area, the three Survey Sites, and the

numerous survey stations contained within each survey site:



44.     The Benson West Survey Site and the Benson Central Survey Site border one another

along a ridge where the blue and yellow shading meet in the figure above; there is no

gap in forest cover greater than 100 meters along that ridge where the two survey

sites meet.

45.    The Benson Central Survey Site and the Benson Southeast Survey Site border one another along a ridge where the yellow shading meets the green shading in the figure above; there is no gap in forest cover greater than 100 meters along that ridge where the two survey sites border one another.

46.    WEST hired subcontractors to physically conduct murrelet surveys in accordance with the PSG's surveying protocol.

47.    WEST's subcontractors received their training and certification in marbled murrelet surveying from Sean McAllister, Mad River Biologists.

48.    In 2015, WEST's survey efforts documented the following murrelet activity (Trial Exhibit 125):

**Figure 3.  Audio-visual survey results by station and visit for marbled murrelets surveys conducted in 2015 in the Benson Ridge South survey area. Survey dates highlighted in blue indicate an audio or visual detection of a marbled murrelet and those highlighted in green indicate a detection of a subcanopy flight/behavior. Details of detections can be found on the original survey forms. See Exhibit 125.**

| Survey Site | Survey Station | 2015 Audio Visual Survey Visits | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Benson Central | BR1 | | 5/14* | | 6/13 | | | | | |
| | BR6 | | | | | | | 7/4 | | 7/24** |
| | BR7 | | | | | | 6/25 | | | |
| | BR8 | | | | | | | | 7/10 | |
| | BR9 | | | | | 6/19 | | | | |
| | BR10 | 5/6 | | | | | | | | |
| | BR17 | 5/5* | | 6/4 | | | | | | |
| | BR20 | | 5/15 | | | | | | | |
| Benson SE | BR13 | | | | 6/4 | | | | 7/16 | |
| | BR15 | 5/5 | | | | | | | | |
| | BR19 | | 5/15 | | | | | 7/10 | | 7/23 |
| | BR21 | | | | 6/13 | | | | | |
| | BR22 | | | | | | 6/28 | | | |
| | BR23 | | | | | 6/20 | | | | |
| Benson West | BR11 | 5/4 | | 5/18 | | 6/28 | | 7/16 | | |
| | BR12 | | 5/11 | | 6/12 | | 7/10 | | | |

\*    Extra survey, not counted as a regular visit as per protocol
\*\*  Two audio detections and one visual detection (direct flight @ 1.5x canopy)
        Indicates stations in the buffer zone, not on Scott Timber property
        Visual Detection: With or without additional audio detections
        Audio Detection Only

49.    The 2015 WEST survey efforts in the Benson South Survey Area documented 8 total murrelet audio and above-canopy detections but no sub-canopy detections.  WEST also had 14 detections of marbled murrelets in 2015 in the suitable habitat in and around the northern portion of the parcel, thought this habitat is separated from the Benson South Survey Area by the unsuitable habitat in the middle of the property.

50.    In 2016, WEST's survey efforts documented the following murrelet activity (Trial Exhibit 127):

**Figure 5. Audio-visual survey results by station and visit for marbled murrelets surveys conducted in 2016 in the Benson Ridge South survey area. Survey dates highlighted in blue indicate an audio or visual detection of a marbled murrelet and those highlighted in green indicate a detection of an subcanopy flight/behavior. Details of detections can be found on the original survey forms.  See Exhibit 127.**

| Survey site | Survey station | V1 | V2 | V3 | V4 | V5 | V6 | V7 | V8 | V9 |
|---|---|---|---|---|---|---|---|---|---|---|
| Benson Central | BR01 | | | | | 7/8 | | | | |
| | BR06 | | | | | | 7/14 | | | |
| | BR07 | | | | 6/26 | | | | | 8/1 |
| | BR08 | | | 6/1 | | | | | | |
| | BR09 | | | | | | | 7/20 | | |
| | BR10 | | 5/25 | | | | | | | |
| | BR17 | 5/3* | | | | | | | | |
| | BR20 | | | | | | | | 7/26 | |
| Benson SE | BR13 | | | 6/4 | | | | | | 8/3 |
| | BR15 | 5/2 | | | | | | 7/24 | | |
| | BR19 | | | | 6/21 | | | | 7/30 | |
| | BR21 | | | | | | 7/17 | | | |
| | BR22 | | | | | 7/9⁶ | | | | |
| | BR23 | | 5/17 | 5/20* | | | | | | |
| Benson West | BR11 | 5/2 | | | 6/24 | | 7/15 | | | |
| | BR12 | | 5/9 | 6/3 | 6/7* | 7/10 | | | | |
| | BR29** | | | | 6/7* | | | | | |
| | BR30** | | | | 6/7* | | | | | |

* Extra survey, not counted as a regular visit as per protocol.
** Station added for extra survey effort to further investigate subcanopy detections
³ 2 audio only detections and one visual detection (direct flight @ 2.0x canopy height)
⁶ 11 detections, mostly audio only. Two visuals (1 circling @ 1.2x canopy height, and 1 direct flight @1.1 canopy height)

Indicates stations in the buffer zone, not on Scott Timber property
Visual detection: occupied/subcanopy behavior
Visual detection: above canopy with and without additional audio detections
Audio detection only

51.  The 2016 surveys by WEST had at least 183 murrelet detections across the Benson
     South Survey Area, of which 25 were sub-canopy "occupied" detections (some of the
     surveys had multiple observations of sub-canopy flight at the same station).  WEST
     documented 76 detections in the Benson Southeast Survey Site.  Of those, 55
     detections were at survey station BR23, including 13 instances of sub-canopy
     behavior.  At BR23, WEST identified at least one possible marbled murrelet nest site
     in the vicinity, based on the observation of a murrelet landing in a suspected nest tree
     near the survey station. WEST documented at least 94 detections in Benson West,
     including 12 instances of subcanopy behavior in the Benson West Survey Site.
     WEST documented 13 detections of murrelets in the Benson Central Survey Site in
     2016, including one above-canopy visual detection and 12 audio detections.  In 2016,
     WEST also had 54 detections of marbled murrelets in and around the northern portion
     of the property, including 1 sub-canopy detection.

52.  A map summarizing WEST's overall survey effort in and around the Benson Ridge
     Tract appears below (Trial Exhibit 32, page 12):



Figure 3. Survey results of 2015 and 2016 combined survey results. The classification of each point was based on the 2-year effort.

53.    WEST concluded that the results of its 2015 and 2016 survey efforts demonstrated that marbled murrelets likely used the Benson West and Benson Southeast Survey Sites for nesting in 2016.

54.    WEST further concluded that the Benson Central Survey Site was likely not used by murrelets for nesting in 2015 or 2016, as WEST's surveys did not identify any sub-canopy behavior during those survey years.

55.    Defendants admit that, according to the PSG Protocol (as described above), the entire Benson South Survey Area would be considered "occupied" by marbled murrelets because two of the three Survey Sites within a single contiguous Survey Area

documented "subcanopy" behavior.

56.  Prior to the Benson Ridge parcel being sold to Defendants, members of a volunteer wildlife survey organization called Coast Range Forest Watch (CRFW), including Clark McMahon and Max Beeken, conducted marbled murrelet surveys within the Benson Ridge parcel. These surveys took place in 2014.

57.  CRFW's surveyors, including Mr. McMahon and Mr. Beeken, received their training and certification in marbled murrelet surveying under the PSG Protocol from Sean McAllister, Mad River Biologists.

58.  The surveys conducted by CRFW documented two "presence" detections at a survey station in what is now described as the Benson Central survey area and, without prejudice to their right to challenge the accuracy or veracity of other alleged CRFW observations, Defendants do not dispute these two presence detections.

59.  Mr. McMahon alleges that he had a presence and a sub-canopy detection of murrelets near what is described on WEST's maps (above) as survey station "BR8" on May 24, 2014. BR8 is contained within the Benson Central survey site and is inside the proposed logging unit. Defendants dispute whether this survey occurred and, if it did, whether the detection was truly "sub-canopy."

**Benson Snake Logging Operation**

60.  Defendants submitted a notification to the Oregon Department of Forestry on August 13, 2016, outlining Defendants' intent to harvest timber in the 49-acre Benson Snake harvest area. The Benson Snake logging operation will clearcut 49 acres of mature forest, approximately 130 years of age, with the exception of required leave trees and stream buffers required by the Oregon Forest Practices Act. Exhibit 104 is a map

outlining the proposed harvest area, with the area to be harvested contained within the hatch marks.



61.    Defendants intend to implement the Benson Snake logging operation unless the Court determines it violates Section 9 of the ESA and Plaintiffs are entitled to an injunction prohibiting the operation under the applicable law.  Defendants will conduct the harvest during the non-nesting season (September 16-March 31).

62.    Following this Court's issuance of a preliminary injunction in 2016, Joel Thompson of WEST prepared a report for Defendants' counsel summarizing the results of the 2015 and 2016 surveys, Mr. Thompson's interpretations of the results, as well as

advising how the PSG Protocol would recommend interpreting the results.  In that report, Mr. Thompson stated: "Given the site-specific data now available, survey results seem to suggest that Benson Central was not occupied in 2015 or 2016, and that the one subcanopy detection reported by CRFW in 2014 is ambiguous given the additional knowledge gained during 2015 and 2016 surveys. However, because Benson Central is located adjacent to survey sites that were considered occupied based on observed subcanopy behavior, the PSG Protocol (Evans Mack 2003) would suggest that Benson Central also be considered occupied due to its adjacency to occupied habitat."

63.    Defendants have not applied for an "Incidental Take Permit" nor prepared a "Habitat Conservation Plan" pursuant to Section 10 of the Endangered Species Act for the planned timber harvest operation.  16 U.S.C. § 1539(a)(1)(B). * [4]

## IV.    CLAIMS AND DEFENSES.

*For the Plaintiffs*: This case concerns a single claim under Section 9 of the Endangered Species Act.  To prevail, Plaintiffs must establish, by a preponderance of the evidence, that Defendants' proposed clearcutting of the Benson Snake harvest area will cause "take" of a marbled murrelet.  The definition of "take" includes the terms "harm" or "harass," which have been defined in pertinent part by the Department of Interior as follows:

> Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.
>
> Harass in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to

---

[4] Defendants dispute the relevance of this fact.

such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.

50 C.F.R. § 17.3. The prohibition against a "take" applies equally to endangered and threatened species. 50 C.F.R. § 17.21.

Plaintiffs will demonstrate at trial that the Benson South Survey Area is occupied by marbled murrelets; that marbled murrelets use and rely upon the proposed logging unit and surrounding environments for essential behavior patterns, including breeding and sheltering; and that clearcutting the 49-acre Benson Snake harvest area will "harm" or "harass" marbled murrelets by impairing these essential behavioral patterns.

Defendants intend to clearcut 49 acres of mature forest habitat that is occupied by marbled murrelets. An occupied site is, by definition, and single contiguous block of suitable murrelet habitat. Occupied sites include nest sites, but an occupied site also can be used for purposes other than nesting such as courtship and other social behaviors, that are essential for the complete life history of the bird. Clearcutting occupied murrelet habitat significantly disrupts murrelet nesting and other reproductive and breeding behaviors, especially considering murrelets' high fidelity to breeding sites.

Murrelets are harmed not only by the loss of nesting habitat, but by the fragmentation and degradation of remaining forest patches. Marbled murrelet nesting sites are positively associated with large core areas of mature forest, low amounts of forest edge, and reduced habitat fragmentation. The loss and fragmentation of suitable habitat in an occupied murrelet site will cause murrelet death, displacement, fewer nesting attempts, increased nest failures, reduced fecundity, reduced nest abundance, lower nest success, increased predation, crowding of remaining habitat, and reductions in adult survival.

Finally, there is a direct correlation between the amount of suitable nesting habitat in an area and the population of murrelets in that area. The overwhelming majority of murrelet nesting habitat in the continental United States has already been lost due to logging. Marbled murrelets are threatened with extinction specifically because of "the loss and modification of nesting habitat (older forests) primarily due to commercial timber harvesting." 57 Fed. Reg. 45,328 (Oct 1, 1992); see also *id.* at 45,330 ("The principal factor affecting the marbled murrelet in the three-state area, and the main cause of population decline has been the loss of older forests and associated nest sites"). Given the specific needs of this species, the historic loss of so much of its nesting habitat, and the direct correlation between available nesting habitat and murrelet populations, the loss of yet more suitable murrelet habitat is more likely than not to cause a significant disruption in breeding and sheltering patterns by forcing murrelets into less hospitable habitat where it will be susceptible to predation and nest failure. This increases the likelihood of injury to murrelets by annoying them, significantly disrupting normal behavioral patterns, and by forcing them into unsuitable habitat where their survival is dubious, at best.

Plaintiffs will rely upon CRFW's citizen survey efforts, WEST's survey data, the PSG Protocol, and the breadth of experience and knowledge about marbled murrelets possessed by Plaintiffs' expert witnesses.

*For the Defendants*: Defendants contend that Plaintiffs lack Article III standing to maintain this action, and it should be dismissed with prejudice. As to liability, Defendants contend, *inter alia*, as follows:

1. Plaintiffs misunderstand their burdens or proof in this case, including the factual elements of causation they must prove, and they will fail to meet those burdens.

2. Plaintiffs will fail to prove that Defendants are the proximate cause of one of more of their theories of liability because they depend on independent factors that are out of Defendants' control including, but not limited to, the illegal dumping of garbage and urban and agricultural land uses of non-parties.

3. Plaintiffs will otherwise be unable prove the elements of their theories of liability including, but not limited to: (a) that marbled murrelets nested the Benson Snake harvest unit in 2014-2016, or used it for any other essential behavioral purpose, and that marbled murrelets will attempt to nest in the unit in future years; (b) that marbled murrelets' attempts to nest in the unit to carry out essential behavioral functions in future years will be significantly impaired as result of the harvest and, as a result of such impairment, suffer actual injuries; and (c) that the existence of the harvested Benson Snake unit will lead to other future conditions and events that will, in turn, lead to the substantial impairment of the behavioral functions of marbled murrelets using adjacent forests and, as a result of such interference, cause them actual injuries.

## V.    OTHER LEGAL ISSUES.

The Parties anticipate raising *Daubert* issues in their upcoming trial briefs. The Parties may also be filing appropriate motions *in limine*. The parties reserve the right to request the opportunity to file post-trial briefs.

## VI.    PROPOSED AMENDMENTS TO THE PLEADINGS.

None at this time.

JOINTLY SUBMITTED THIS 23rd DAY OF April, 2019.

/s/ Daniel R. Kruse
DANIEL R. KRUSE (OSB 064023)
dan@speakthelaw.com
101 East Broadway, Suite 130
Eugene, OR 97401
(541) 687-6788
(541) 345-3373 (fax)

NICHOLAS S. CADY (OSB 113463)
nick@cascwild.org
Cascadia Wildlands
PO Box 10455
Eugene, Oregon 97455
(541) 434-1463
(541) 434-6494 (fax)

BRIAN P. SEGEE (*pro hac vice*)
bsegee@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 1646
OjaI, CA 93024
(802) 750-8852

DANIEL C. SNYDER (OSB 105127)
dan@tebbuttlaw.com
Law Offices of Charles M. Tebbutt, PC
941 Lawrence St.
Eugene, OR 97401
(541) 344-3505
(541) 344-3516 (fax)

*For Plaintiffs*

/s/ Dominic M. Carollo
DOMINIC M. CAROLLO (OSB 093057)
dcarollo@yockimlaw.com
Yockim Carollo LLP
430 SE Main Street
PO Box 2456
Roseburg, Oregon 97470
(541) 957-5900
(541) 957-5923 (fax)

*For Defendants*

**ORDER:**

This pretrial order, proposed jointly by the parties, is accepted by the Court and entered. Pursuant to Fed. R. Civ. P. 16(d) and Local Rule 16-5, the pretrial order amends the parties' pleadings and controls the upcoming trial and any subsequent proceedings in this case. The facts stipulated to herein are deemed proven without further production of evidence at trial, unless a dispute over their accuracy or relevancy is expressly noted in the body of this order.

IT IS SO ORDERED this _23rd_ day of _April_____, 2019.


_____
Honorable Ann L. Aiken
United States District Court Judge

## CERTIFICATE OF FILING AND PROOF OF SERVICE

I hereby certify that on April 23, 2019 I filed the foregoing **Pretrial Order** in person on the record in court.  I further certify that I served the foregoing **Pretrial Order** on Defendants' counsel in person on the record in court.

Dated this 23rd day of April, 2019.

/s/ Daniel R. Kruse

DANIEL R. KRUSE (OSB 064023)
dan@speakthelaw.com
101 East Broadway, Suite 130
Eugene, OR 97401
(541) 687-6788
(541) 345-3373 (fax)